B J Fadem, Esquire, Bar #118819
LAW OFFICES OF B J FADEM, APC
255 N. Market Street, Suite 210
San Jose, California 95110
408-280-1220 (voice)
408-292-4100 (fax)
fademlaw@sbcglobal.net

**FILED**

DEC 1 0 2007



CLERK U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN JOSE

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF CALIFORNIA
San Jose Division

DESPINA ASVESTA,
22 Platonos Street
Nikaia, 18454
Piraeus, Greece

      Petitioner

      v.

GEORGE PETROUTSAS
300 Plum Street, SPC 69
Capitola, California 95010

      Respondent

_____/

Case No.   C 07 05535 JF

RESPONDENT'S
MEMORANDUM

Hearing Date: 12/17/07
Time:          9:00 am
Courtroom:    3


    This memorandum is submitted on behalf of respondent, George Petroutsas and

supplements Respondent's Pre-Hearing Memorandum.

## THIS COURT SHOULD NOT GIVE COMITY TO THE GREEK ORDERS

### A. Principles Applicable to Comity Analysis

Comity is neither a matter of absolute obligation nor a consequence of mere courtesy and

good will. It is -- as the U.S. Supreme Court ruled in the seminal case of Hilton v. Guyot,

159 U.S. 113, 16 S. Ct. 139, 40 L. Ed. 95 (1895) -- "the recognition which one nation

allows within its territory to the legislative, executive, or judicial acts of another nation,

having due regard both to international duty and convenience, and to the rights of its own

citizens, or of other persons who are under the protection of its laws." In Hilton the

Court afforded comity to certain French judgments only because each of the following

conditions was satisfied:

a. "[T]hat there has been opportunity for a full and fair trial abroad before a court of
competent jurisdiction";
b. That the trial was "conduct[ed] … upon regular proceedings, after due citation or
voluntary appearance of the defendant:'
c. That the trial was conducted "under a system of jurisprudence likely to secure an
impartial administration of justice between the citizens of its own country and those of
other countries";
d. "[T]hat there is nothing to show either prejudice in the court, or in the system of laws
under which it was sitting:"
e. That there is nothing to show "fraud in procuring the judgment"; and
f. That there is no "other special reason why the comity of this nation should not allow it
full effect."

In more recent cases, federal and state courts have confirmed that:   They will

defer to foreign proceedings only if "enforcement does not prejudice the rights of United

States citizens or violate domestic public policy." Finanz AG Zurich v. Banco Economico

S.A., 192 F.3d 240, 246 (2d Cir.1999), quoting Victrix S.S. Co., S.A. v. Salen Dry Cargo

A.B., 825 F.2d 709, 713 (2d Cir.1987);

They will not give effect to foreign judicial proceedings "in situations where the original claim is repugnant to fundamental notions of what is decent and just in the State where enforcement is sought." Yahoo!, Inc. v. La Ligue Contre Le Racisme et L'Antisemitisme, 433 F.3d 1199 (9th Cir. 2006) or that are "grounded on policies which do violence to [their] own fundamental interests" Laker Airways v. Sabena Belgian World Airlines, 731 F.2d 909, 931 (D.C.Cir.1984).

They will not afford comity to foreign orders that violate the protections of the United States Constitution, for example by chilling protected speech that occurs simultaneously within the United States. Matusevitch v. Telnikoff, 877 F.Supp. 1, 4 (D.D.C.1995) (declining to enforce British libel judgment because British libel standards "deprive the plaintiff of his constitutional rights").

They will not afford comity unless the foreign procedures provide "a system compatible with the requirements of due process of law." International Transactions Ltd. v. Embotelladora Agral Regiomontana, 347 F.3d 589, 594 (5th Cir.2003); In re Hackett, 184 B.R. 656, 658 (Bankr.S.D.N.Y.1995); In re Gee, 53 B.R. 891, 901 (Bankr.S.D.N.Y.1985).

In Innes v. Carrascosa, 391 N.J. Super. 453; 918 A.2d 686 (NJ Super. Ct., App. Div. 2007) -- an international child custody case that has significant parallels to the case at bar -- a New Jersey appellate court earlier this year refused to afford comity to a Spanish ruling concerning child custody and Hague Convention issues.

In Innes the parties lived in New Jersey, where their child was born in 2000. The parties commenced competing custody, divorce and annulment actions in Spain, the mother's country of origin, and New Jersey. The mother then unilaterally took

the child to Spain. A New Jersey court gave temporary custody of the child to the father,

who then sought the child's return from Spain pursuant to the Hague Convention. A

Spanish court dismissed the father's Hague petition on the ground that he did not have

custody. On appeal, a Spanish appeal court affirmed the dismissal of the Hague petition.

It ruled that the mother had custody and that the provision in an agreement between the

parents concerning custody, whereby neither party could take the child out of New

Jersey, was in derogation of the Spanish Constitution's guarantee that all Spanish citizens

may freely choose their place of residence. Subsequently the Spanish court granted

annulment and sole custody to the mother. The New Jersey court then conducted a trial

concerning divorce and custody. The mother's attorneys argued that the Spanish rulings

should be recognized under res judicata and comity principles and that the New Jersey

action should therefore be dismissed. The New Jersey court ruled that it had jurisdiction

to grant a divorce and continuing exclusive jurisdiction as to custody issues, and granted

a divorce in favor of the father and awarded sole custody of the child to him. The mother

appealed contending, inter alia, that the New Jersey court should have afforded comity to

and accepted the findings of the Spanish court that the mother had sole custody of the

child. The New Jersey appeal court examined the Spanish rulings and decided that it

should not grant comity to them.

     **First,** it held that the rulings of the Spanish courts were in complete derogation of

the Hague Convention for the following reasons:

- Although the Spanish courts had acknowledged that New Jersey

was the child's habitual residence before she was removed, they had failed to

apply New Jersey law to determine whether the father had rights of custody, as

required by Article 3 of the Hague Convention.

- The Spanish courts should have recognized the parents' custody agreement, since Article 3 of the Convention provides that custody rights may arise "by operation of law, or by reason of an agreement having legal effect under the law of that State."

- The Spanish courts had erroneously ignored the orders entered by the New Jersey court of first instance granting custody of the child to the father.

- Under New Jersey statutory law the father possessed rights to the child even absent a formal judgment of custody since whenever the Superior Court has jurisdiction over the custody of a minor, the minor may not be removed from the jurisdiction without the consent of both parents or the court.

Consequently, the New Jersey appeal court ruled that, "Under New Jersey law, therefore, the taking of the child to Spain without [the father's] consent or knowledge was improper and the holdings of the Spanish courts finding otherwise are in direct contravention with the laws of this state and the Hague Convention. Had the Spanish courts applied the law which governs under the Convention, they would not have arrived at an erroneous result."

**Second**, the New Jersey court found that the decisions of the Spanish courts because it found that their decisions contravened the public policy of New Jersey with regard to parental rights, stating that, "Our courts have long held that recognition of foreign judgments should not be given where such decisions violate the public policy of this state." In this regard, the Court not only cited New Jersey cases but also a statutory provision in New Jersey that set forth the public policy of New Jersey that "both parents

should share in the custodial rights of the child" (N.J.S.A. 9:2-4) and the Restatement

(Third) of the Foreign Relations Law of the United States, § 482(d) (1986) that, "[a] court

need not recognize a judgment of the court of a foreign state if the cause of action on

which the judgment was based, or the judgment itself, is repugnant to the public policy of

the United States or of the State where recognition is sought." The Court found that the

Spanish court's decisions plainly contravened such public policy.

It is respectfully submitted that similar principles apply in the present case.

**B. Public Policy as It Applies to International Child Abduction**

**(a) California's Public Policy**

The California legislature has set forth in the strongest possible terms that it is

California's public policy that both parents should have equal rights of custody

concerning their child; that removing a child from the other parent is abhorrent and

constitutes child abuse; and that international parental child abduction is a crime. [i.e. as

in this case, It is undisputed that Father gave Mother authorization to have the child with

her in Greece *only until December 8, 2005* and that she retained the child;  it is further

undisputed that the Superior Court of Santa Cruz has issued numerous orders since

November 30, 2005 granting Father sole legal and physical custody and ordering Mother

to return with the child where in Mother's custody and visitation could be considered]

Thus:

- Section 3020(b) of the California Family Code states that:

"(b) The Legislature finds and declares that it is the public policy of this state to assure

that children have frequent and continuing contact with both parents after the parents

have separated or dissolved their marriage, or ended their relationship, and to encourage

parents to share the rights and responsibilities of child rearing in order to effect this
policy, except where the contact would not be in the best interest of the child, as provided
in Section 3011."

- Section 3048 of the California Family Code requires that every child custody
  order must specifically address issues designed to prevent the abduction of the
  child, including stating the habitual residence of the child.

- Sections 278 and 278.5 of the California Penal Code provide that it is a felony,
  punishable by up to three years in prison and a $10,000 fine, for a parent to take,
  entice away, keep, withhold, or conceal any child from a lawful custodian or a
  person with a right to visitation.

- California has established a "Child Abduction Task Force" under the sponsorship
  of the Governor's Office of Criminal Justice Planning. Indeed, California's
  system for handling intrastate, interstate, and international child abductions has
  served as a model for the rest of the country. The pivotal element of California's
  system has been a statutory scheme that requires district attorneys to "take all
  actions necessary" to locate and return abducted children. District attorneys have
  created child abduction units or designated personnel within each county office to
  specifically work on child abduction cases. See California Child Abduction Task
  Force Summary Report Third Edition 2003 –
  [http://www.oes.ca.gov/Operational/OESHome.nsf/PDF/Child%20Abduction%20
  Report/$file/ChildAbductRept.PDF]

- It is the express public policy of the State of California that "Child Abduction is Child Abuse." In its 2003 report (*id* at p. 13), the Child Abduction Task Force found that: **"Child Abduction is Child Abuse"**

In each case of abduction, the child, the family, and the community are irrevocably changed by the tragedy of this form of child abuse. The task force views both family and non-family abductions as forms of child abuse. While the psychological trauma inflicted upon a child abducted by a nonfamily member is commonly acknowledged, abduction by a parent or other family member has long been minimized as having few serious consequences because the child knows the abductor. However, children who are abducted, whether by a family member or by a person unknown to the child, suffer serious psychological and emotional trauma."

**(b) Federal Public Policy**

**(i) In General**

The policy of the U.S. Congress as to international child abduction is equally strong. It is set forth in the International Child Abduction Remedies Act, 42 U.S.C. 11601 *et seq.* in which Congress expressly made the following findings:

"(1) The international abduction or wrongful retention of children is harmful to their well-being.

(2) Persons should not be permitted to obtain custody of children by virtue of their wrongful removal or retention.

(3) International abductions and retentions of children are increasing, and only concerted cooperation pursuant to an international agreement can effectively combat this problem.

(4) The Convention on the Civil Aspects of International Child Abduction, done at The

Hague on October 25, 1980, establishes legal rights and procedures for the prompt return

of children who have been wrongfully removed or retained, as well as for securing the

exercise of visitation rights.

Children who are wrongfully removed or retained within the meaning of the

Convention are to be promptly returned unless one of the narrow exceptions set forth in

the Convention applies. The Convention provides a sound treaty framework to help

resolve the problem of international abduction and retention of children and will deter

such wrongful removals and retentions." (42 USCA 11601)

Based upon those findings, the United States became a party to the Hague

Convention, established legislation to implement the Convention and required the Office

of the United States Secretary of State to act as the Central Authority for implementation

of the treaty.

In 1993 Congress passed the International Parental Kidnapping Crime Act,

18 U.S.C. 1204, making it a federal felony to remove a child from the United States or

retain a child (who has been in the United States) outside the United States with intent to

obstruct the lawful exercise of parental rights.

A fundamental purpose of the strong public policy against international child

abduction by a parent is to deter parental abductions by "depriving the abductor's actions

of any practical or juridical consequences," and thus eliminating the "primary motivation"

for the abduction - to obtain an advantage in custody proceedings by

commencing them in another country. Mozes v. Mozes, 239 F.3d 1067 at 1070 (9th Cir.

2001) (citations and internal quotation marks omitted).

### (ii) Policy of Demanding Treaty Compliance by Other Countries

It is also the firm policy of the United States to take all necessary steps to ensure that other parties to the Hague Convention comply with their treaty obligations under the Convention. The purpose of this policy is to ensure that there is no discrimination against United States citizens who may be forced to return their children from the United States while other countries do not follow reciprocal practices.

The issue came to the fore in recent years in Congressional hearings concerning the refusal of certain European countries to return abducted American children. Those hearings led to the General Accounting Office's issuance of reports that recommended reforms designed to ensure that other countries do not damage American children by interpreting the Hague Convention wrongly or so as to favor their own nationals. See the GAO Report to the Chairman, Committee on International Relations, House of Representatives, March 2000.   [http://www.findthekids.com/pdf/gao2.pdf.]

In that regard, in 2000 the Congress passed a joint resolution -- Resolution 293, 106th Congress 2000, the text of which is set forth in the Appendix to this brief -- which urges "all contracting parties to the Hague Convention, **particularly European civil law countries that consistently violate the Hague Convention** such as Austria, Germany and Sweden, to comply fully with both the letter and spirit of their international legal obligations under the Convention.....to ... ensure their compliance with the Hague Convention by enacting effective implementing legislation and educating their judicial and law enforcement authorities; and ... to honor their commitments and return abducted or wrongfully retained children to their place of habitual residence without reaching the merits of any underlying custody dispute and ensure parental access rights by removing

obstacles to the exercise of such rights." (emphasis added).

Congressional hearings also led to the enactment of Public Law (PL) 105- 277, Section 2803 which requires the Department of State's Office of Children's Issues to submit annual reports to Congress on the compliance by other countries of their Hague Convention treaty obligations.

It is pursuant to that law that the Secretary of State earlier this year issued a report castigating Greece for a pattern of noncompliance with its obligations under the Hague Convention. Indeed the Secretary of State has expressly found that the Greek courts typically violate their obligations under the Convention by:

- Treating Convention cases as custody matters;

- Basing cases on the best interests of the child or other criteria outside the boundaries of the Convention;

- Using Article 13(b) of the Convention excessively to refuse returns; and

- Exhibiting a bias in favor of Greek parents.

[See, **Affidavit of Susan E. Rohol, General Counsel of The National Center for Missing and Exploited Children (NCMEC) attached hereto and incorporated herein**]

In the pending case the Greek courts have committed each and every such kind of misconduct set forth above. In addition, The Greek Court *refused* to allow George Petroutsas to have his legal counsel (who had been retained and spent hours preparing him and his witnesses for the hearing) represent him at that hearing. Instead, a Greek *government employee (not an attorney)* was appointed AT THE HEARING to represent

him – who had approximately thirty five (35) minutes to prepare him and his witnesses

for the hearing.  [**See, Affidavit of Stelios Gregoriou and Nineta Papadavid attached**

**hereto and incorporated herein.**]

### C. Public Policy in the Pending Case

In the present case there can be no issue as to the fact that the child was habitually

resident in California from the date of his birth; that he was taken to Greece by his

mother for a purely temporary visit; and that he was kept in Greece over the strong

objections of his father and in plain violation of the repeated orders of the courts of

California. In these circumstances, the public policies of California and the United States

compel the conclusion that he should not now be ordered to leave California and to return

to Greece.

### (a) The Greek Orders Contravene the Hague Convention

The reasons given by the Greek courts for denying the father's Hague application

are plainly erroneous, for the following reasons (as stated in the Pre-Hearing Brief):

- The finding that the father consented to the retention is flatly refuted by the travel
  authorization and his consistent demands that the Child be returned.

- The finding that the father was not exercising custody was supported by no
  significant evidence cited by the Greek court and is in flagrant violation of the
  universal interpretation of Article 13(a) of the Hague Convention that the defense
  of non-exercise of custodial rights requires clear and unequivocal proof of
  abandonment of the child.

- The finding of grave risk of harm is equally mistaken, as it is not supported by a scrap of relevant evidence and is based on the patently improper ground that the mother might choose to damage the child by not returning with him to California.

A fair reading of the Greek orders compels the conclusion that the Greek courts improperly chose to reward the mother's abduction and her choice of a forum in Greece.

It is submitted that this court should not endorse such misconduct.

### (b) The Greek Orders Violate Due Process

#### (i) Violation of the Right to Counsel of One's Own Choosing

It will be shown that the father was unfairly prevented at the Greek Hague hearing from being represented by his chosen attorney, Nineta Papadavid, whom he had retained and who was prepared to handle his application.   Instead the father was required to use "the authorized Judicial representative of the Legal Council of State," a government employee – *who was NOT a lawyer*, the name of Anastasios Rallis. It is respectfully submitted that that failure is of such significance that it should absolutely bar an American court from affording comity to the Greek orders.

The right to be heard through one's own counsel is "unqualified." Chandler v. Fretag, 348 U.S. 3 (1954). In Powell v. Alabama, 287 U.S. 45 at 68-69, the Supreme Court asked:  "What, then, does a hearing include? Historically and in practice, in our own country at least, it has always included the right to the aid of counsel when desired and provided by the party asserting the right.  The right to be heard would be, in many cases, of little avail if it did not comprehend the right to be heard by counsel. Even the

intelligent and educated layman has small and sometimes no skill in the science of law. "… If in any case, civil or criminal, a state or federal court were arbitrarily to refuse to hear a party by counsel, employed by and appearing for him, it reasonably may not be doubted that such a refusal would be a denial of a hearing, and, therefore, of due process in the constitutional sense."

### (ii) Violation of the Right to Consult with Counsel

Respondent met attorney Rallis for the first time in the courthouse a matter of minutes before the hearing. He was allowed little or no time with which to consult with his new representative – a non-lawyer. This is a clear and substantial violation of his right to due process.

A necessary corollary of the right to select counsel is that a litigant must be given a reasonable opportunity to consult with counsel; otherwise, the right to be heard by counsel would be of little worth. Powell v. Alabama, supra.

### (iii) Bias of the Greek Courts

The bias that the Greek court displayed against the respondent is evident from the order of the Piraeus Court dismissing the Hague application and confirmed by the State Department. At the outset the order describes respondent as seeking an order that the mother be "forced to deliver the child to his father, in order for his to take him back to the place of his permanent residence in California, USA, that a fine and imprisonment be threatened against the respondent in the case that she does not comply…." The Court then proceeded to summarize the evidence in a way that openly mirrored the mother's position and that completely ignored the father's.

The ruling on the Hague application simply ignores the father's position, brands him as a cheating husband and uses that finding as the basis for a finding that the mother was right to move the child to Greece. It contains no recognition of the purposes of the Hague Convention. It makes not an iota of criticism of the mother's conduct in keeping her child in Greece against the wishes of the father. It makes no mention of California law except to describe the dangers of arrest if the mother were compelled to return with the child to California. It entirely ignores the rulings as to custody of the California courts. And it demonstrates a complete disregard for the fundamental purpose of the Hague Convention of preventing one parent from removing a child from his habitual residence and then seeking a favorable custody order from the new forum.

The Greek Court order also vaguely refers to Father not exercising his custody of the minor child. However, this conclusion falls flat without evidence also. As set forth in the affidavits of Bessie Petroutsas, Claudia Morales, Jordan Kokkoros, and Dionysis Heliotis.

## CONCLUSION

The purpose of comity is to respect foreign actions whenever it is appropriate to do so without adversely affecting the rights of American citizens or state or federal public policy. The U.S. State Department has denounced Greece for not complying with its obligations under the Hague Convention. In particular, the State Department has expressed particular disapproval of the failure of the Greek judiciary to apply the Convention impartially or appropriately.

The pending case provides a vivid example of the precise behavior on the part of the Greek courts that the State Department has castigated. In these circumstances this

Court should not afford comity to such patently flawed rulings and should not reward the

mother's international child abduction by ordering that the child be returned to Greece

from his habitual residence in California.


Respectfully submitted

Jeremy D. Morley, Esq.
B J Fadem, Esq.

AFFIDAVIT OF SUSAN E. ROHOL

COMMONWEALTH OF VIRGINIA)
                                    )      SS
CITY OF ALEXANDRIA              )

NOW COMES THE AFFIANT, Susan E. Rohol, having been duly sworn according to law,
deposes and states the following:

1.  I am currently employed as the General Counsel of The National Center for Missing and
    Exploited Children (NCMEC). I was previously employed as the Director of the
    International Missing Children's Division and have been employed by NCMEC since
    September 2005.

2.  NCMEC is a private, nonprofit corporation, incorporated under the laws of the District of
    Columbia. NCMEC is not an agency or instrumentality of the United States government
    and neither NCMEC nor its employees are agents of the United States government.

3.  NCMEC, through a grant from the U.S. Department of Justice, handles cases of missing
    children, including those abducted by a parent or family member.

4.  NCMEC has entered into a Cooperative Agreement with the Administrator of the Office
    of Juvenile Justice and Delinquency Prevention to perform certain tasks specified by
    Congress in the Missing Children's Assistance Act, 42 U.S.C. §§ 5771-5773, including
    that of providing technical assistance to local and state governments, public and private
    nonprofit agencies, and individuals in locating and recovering missing children. 42
    U.S.C. § 5773(b)(1)(F).

5.  Pursuant to 22 C.F.R. § 94.2, the U.S. Department of State, Office of Children's Issues,
    performs the functions of the Central Authority for the United States under the Hague
    Convention of October 25, 1980 on the Civil Aspects of International Child Abduction
    (Hague Convention). Pursuant to 22 C.F.R. § 94.6 and agreement among NCMEC, the
    Department of Justice, and the U.S. Department of State, applications seeking the return
    of or access to children wrongfully removed to or retained in the U.S. are processed by
    NCMEC.

6.  NCMEC and the U.S. Department of Justice's Office of Juvenile Justice and Delinquency
    Prevention in cooperation with the American Bar Association (ABA) Center on Children
    and the Law produce a publication titled Family Abduction, Prevention and Response,
    Fifth Ed., copyright March 2002. The Chapter titled *Preventing Abductions* enumerates
    steps parents can take to safeguard their children from abduction, and includes the
    following prevention tips: [For additional information see the following ABA Reports:
    *Early Identification of Risk Factors for Parental Abduction* (NCJ 185026) available at:
    http://www.ncjrs.gov/html/ojjdp/2001_3_1/contents.html and *Family Abductors:
    Descriptive Profiles and Preventive Interventions* (NCJ 182788), available at:
    http://www.ncjrs.gov/html/ojjdp/jjbul2001_1_2/contents.html].

    A.  Obtain a custody/visitation determination that clearly specifies the rights of each
        parent with respect to the child. Avoid using vague language, such as "reasonable

visitation," and avoid joint custody orders in parental abduction and family violence cases. Specify residential arrangements. Consider supervised visitation, bonds and other guarantees, prohibitions on unauthorized pick-up of the child, restrictions on interstate and/or international removal of the child (i.e., surrender passports, prohibit passport applications, notify foreign consulate of passport restrictions.) Authorize law enforcement assistance to recover the abducted child.

B. Be certain that the custody determination clearly states the basis for the court's jurisdiction and the manner in which notice and opportunity to be heard were given to the parties.

C. When considering which prevention provisions to include in the custody determination, evaluate the risk of abduction, the obstacles you may encounter trying to recover your child, and the potential harm the child is likely to suffer if abducted. More restrictive preventive measures will be needed when the risk of abduction is high, obstacles to recovering the child would be difficult to overcome, and abduction is likely to be harmful to the child.

D. Consider "red flag" indicators of abduction risk (below). There may be an increased likelihood of an abduction if a parent has:

    a. Previously abducted the child;

    b. Threatened to abduct the child;

    c. No strong ties to the child's home state;

    d. Friends or family living out of state or in another country;

    e. A strong support network;

    f. No job, is able to work anywhere, or is financially independent—in other words is not tied to the area for financial reasons;

    g. Engaged in planning activities such as quitting a job; selling a home; terminating a lease; closing a bank account or liquidating other assets; hiding or destroying documents; applying for a passport, birth certificates, school or medical records; or undergoing plastic surgery;

    h. A history of marital instability, lack of cooperation with the other parent, domestic violence or child abuse; or

    i. A criminal record.

E. Six personality profiles of abductors (below) may indicate an increased likelihood of an abduction:

Profile 1: Parents who have threatened to abduct or have abducted previously.

Profile 2: Parents who are suspicious or distrustful because of their belief that abuse has occurred and who have social support for their belief.

Profile 3: Parents who are paranoid.

Profile 4: Parents who are sociopathic.

Profile 5: Parents who have strong ties to another country and are ending a mixed culture marriage.

Profile 6: Parents who feel disenfranchised from the legal system (e.g., those who are poor, a minority, or victims of abuse) and have family and social support.

F.  When a court has decided to allow a child to visit or relocate to another country, we recommend that the U.S. court require that the party seeking to remove the child ensure that the U.S. order is registered/domesticated (where possible) in the court of the country to which the child will travel. In order to prevent violations, we recommend that the domesticated order be put in place *prior* to the child's travel to the foreign country.

7.  The Second National Incidence Study of Missing, Abducted, Runaway and Throwaway Children (NISMART – 2), prepared by the Office of Juvenile Justice and Delinquency Prevention, estimates that 203,900 family abduction cases occur annually in the United States. [Full report available at: http://www.missingkids.com/en_US/documents/nismart2_overview.pdf].

8.  Greece ratified the Hague Convention on the Civil Aspects of International Child Abduction on March 19, 1993. The U.S. accepted Greece's ratification to the Hague Convention on June 1, 1993.

9.  NCMEC's international case database contains exclusively cases of international family abduction reported to NCMEC between 1995 and the present. NCMEC records each missing child as an individual case.

10. NCMEC's database reflects that in sixty-seven percent (67%) of our active (unresolved) cases involving children taken from the U.S. to Greece, we have been seeking return of the children for more than five years. Thirty-three percent (33%) of our active (unresolved) cases of children taken from the U.S. to Greece have been unresolved for more than ten years.

11. NCMEC's database reflects that that out of all of our closed cases involving a child taken from the U.S. to Greece, forty-two percent (42%) of the cases were never recovered. NCMEC's database reflects that that in eighty-two percent (82%) of our resolved cases involving a child taken from the U.S. to Greece, we sought the return of the children for more than one year. Out of all our resolved cases involving a child taken from the U.S. to Greece, only eighteen percent (18%) of the recoveries were the result of litigation under the Hague Convention on the Civil Aspects of International Child Abduction.

12. The 2007 Compliance Report for the 1980 Hague Convention on the Civil Aspects of International Child Abduction by the U.S. Department of State states that "Greece continues to demonstrate a pattern of noncompliance with the Convention. The Department sees patterns of noncompliance in both Greek judicial performance and law

enforcement performance. Despite efforts by the Greek Central Authority to educate judges, Greek courts typically treated Convention cases as custody matters, basing cases on the best interests of the child or other criteria outside the boundaries of the Convention.... There were also excessive delays between the court hearings and notification of the court's decision. All of these delays further violated Article 11 of the Convention requiring that Convention cases be handled expeditiously." [Full report available at: http://travel.state.gov/pdf/child_abduction_Compliance_Report.pdf]

13. I declare under penalty of perjury that the foregoing is true and correct to the best of my information and belief.

_____          12-4-07
SUSAN E. ROHOL                             DATE
General Counsel
The National Center for Missing and Exploited Children
Charles B. Wang International Children's Building
699 Prince Street
Alexandria, VA 22314

_____          12/4/07
NOTARIZED                                  DATE

City of Alexandria
Commonwealth of Virginia

The foregoing instrument was subscribed and sworn before me this ____4th____ day of
__December__ by __Susan E. Rono_____.
                    (name of person seeking acknowledgement)

_____.
Notary Public.

My Commission expires: __Sept 30, 2008_____.

[Notary seal stamp]
Notary Public
Commonwealth of Virginia
My Commission Expires Sep 30, 2008

B J Fadem, Esquire, Bar #118819
LAW OFFICES OF B J FADEM, APC
255 N. Market Street, Suite 210
San Jose, California 95110
408-280-1220 (voice)
408-292-4100 (fax)
fademlaw@sbcglobal.net

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF CALIFORNIA
### San Jose Division

DESPINA ASVESTA,
22 Platonos Street
Nikaia, 18454
Piraeus, Greece

   Petitioner

  v.

GEORGE PETROUTSAS
300 Plum Street, SPC 69
Capitola, California 95010

   Respondent

_____/

Case No.   C 07 05535 JF

AFFIDAVIT OF
STELIOS GREGORIOU


## AFFIDAVIT OF GREEK LAW

I, Stilianos H. GREGORIOU, Esquire, hereby depose and say as follows:

1.  I am over the age of eighteen (18), I am competent to be a witness, and I have personal knowledge of the facts and matters pertaining to the interpretation of Greek Law, as stated in this Affidavit.

2.  I am a lawyer in good standing in Greece.

3.  I am qualified to interpret the laws of Greece.

1

4.      I was hired to serve as the attorney -at- law on behalf of Mr. George Petroutsas from November 2005 through now, December 2007.

5.      The case as it stands now in Greece is evolving in three distinct fields of Greek law.

i) The Abduction and the Application of Hague Convention by the Greek Courts

ii) The custody and visitation rights

iii) The Recognition and Enforcement of the Santa Cruz District Court Decision.

6.      As far as it is concerned the Abduction of little Andonis by his mother, the Petitioner, and the relevant Application of Hague Convention by the Greek Courts, I depose the following:

7.      Mr. Petroutsas, after consultations by phone with me some days after the abduction, namely early December 2005, filed his Hague Petition with the U.S. State Department under the Hague Convention on the Civil Aspects of Child Abduction.

8.      In December 2005 the U.S. State Department Intern sent this petition to the Greek Central Authority (Ministry of Justice), that designated a Hearing dated on March 23, 2006.

9.      On the Hearing of March 23, 2006, the Single Member Court of Piraeus judged the case of The Greek Public vs. Despina Asvesta and pursuant to the Judgment No. 5042/2006 dismissed the Petition of Mr

2

Petroutsas.

10.      At the time of the Hearing, Mrs Papadavid was Mr. Petroutsas' attorney and was present to the court as such under her quality .

11.      According to an extreme interpretation of the Hague Convention by the Greek Public the attorney of Mr Petroutsas was not allowed to speak on Mr. Petroutsas' behalf because the Greek Minister of Justice had appointed a government employee, Mr. Anastasios Ralis (not an attorney), to serve as Mr. Petroutsas' representative at the hearing. It was explained by the Court that as the case under his Hague petition was being brought before the Greek courts by "The People" instead of Mr. Petroutsas as an individual petitioner, he was not to be allowed individual counsel in this matter. This is an arbitrary and contra legem implementation of the Hague Convention by the Greek Authorities that affects the right of a fair trial in terms of legal representation of the petitioner and the standards of the Hague Convention on the Civil Aspects of Child Abduction.

12.      At the hearing, a Court Clerk or Court Reporter was not present at any time. Mr. Petroutsas was not allowed to speak at the trial and was not allowed to defend himself against any harmful allegations made at the trial. Mr. Petroutsas could only be represented by Mr. Ralis and by one witness allowed to speak on Mr. Petroutsas' behalf.

13.      All the violations of the Convention referred in the "Report on Compliance with the Hague Convention on the Civil Aspects of

3

International Child Abduction" by the US Ministry of Justice, which listed Greece as a non - compliant part with the Hague Convention, were present at the said Hearing.

14. The Single Member Court of First Instance of Pireaus issued under injunctive measures procedure the Court Decision 5042/2006, by virtue of which, surprisingly enough, it was rejected the Petition of Mr Petroutsas for the return of the minor to his habitual residence.

15. These blatant violations against the Hague Convention on the Civil Aspects of Child Abduction from the part of Greece that were also present in Mr. Petroutsas' hearing and the issued Court Decision are listed below:

a. An Order by the Court under the Hague Convention for Child Abduction should only determine which the habitual residence of the child was at the time of abduction. The Greek Court did not at any time mention or determine the habitual residence of the child as required by the Convention. Instead the Greek Court made essentially a custody determination and did not discuss the merits of the Hague application for the child's return to the United States.

b. The grounds on which the Court Decision was based were only and unilaterally Ms. Asvesta's claims that Court acknowledged them as fact without any supporting evidence. The Judge did not take into account any testimony provided by Mr. Rallis or by Mr. Petroutsas' witness to disprove

4

Ms. Asvesta's claims. Ms. Asvesta's and her witnesses claims were full of falsified statements that could easily have been disproven by the evidence we had provided to the Court, but the Judge did not record that any evidence was presented to counter Ms. Asvesta's claims.

c. Ms. Asvesta's claims included allegations of neglect and abuse and also that Mr. Petroutsas was not exercising custody at the time she took the child to Greece.    Ms. Asvesta did not provide any evidence or abuse or mistreatment.  Mr. Petroutsas provided evidence to show that they were living as a family in California at the time Ms. Asvesta took the child to Greece and refused to return, but this was not entered into the Court record.

d. The Judge erroneously held that since Mr. Petroutsas had given written permission for Ms. Asvesta to travel to Greece there was no abduction. The Judge did not consider that Ms. Asvesta's refusal to return to the United States was also considered abduction under the terms of the Hague Convention on the Civil Aspects of Child Abduction.

3. The Greek Public as the legal representative of Mr Petroutsas absolutely irresponsibly and due to a heavy negligence of its services lost the time limit for the exercise of the remedy of the Appeal against the said Court Order, namely thirty (30) days after the service of the said court Decision to the competent clerks of the Greek Public.

4. The Greek Public filed a Cassation application with the Supreme Court of Greece dated 19th of December 2006 and it was designated a Hearing on

5

the 19th of November 2007, to examine only the legal issues that are regarded as mistakes from our part.

Petroutsas' part filed an individual Intervention in favour of the Greek Public and against the respondent Asvestas with the Supreme Court of Greece in order to have the right of presenting his legal position and to reinforce the legal argumentation during the Hearing.

The Hearing has been postponed for the 18th of February 2008 due to the illness of the competent Reporter, but in the meantime it had been issued the Reporter's opinion on the specific subject matter dated 8th of November 2007, that has in general terms as follows:

The Reporter holds that the Cassation and our Intervention should be accepted on the grounds that the First Instance Court judged on the basis only of the likelihood of the facts and not on the basis of the full evidence of them, due to the fact that the Hearing was governed by the Injunctive measures procedure, but this only for reasons of urgency and not for reasons of evidence .

The First Instance Court of Piraeus Decision grounded its justification to the evaluation of the evidential material sufficing itself to the likelihood and not to the full evidence, which is considered by the Reporter to be a legal mistake of the Decision of the First Instance Court of Pireaus and that Decision should be quashed definitely and to be reexamined on the grounds of full evidence by the Single Member First Instance Court of Pireaus

6

composed by another Judge.

The Hearing to be judged undoubtfully should restitute the legal order and

should permit to Petroutsas part to prove its submissions. It will be

undoubtfully proved by entering in the essence that the habitual residence

of the child as defined by the Hague Convention is in the USA.

The correct and by the Law evaluation of the evidences should prove that
George Petroutsas did not actually give any permission to his wife to
move to Greece with the child; i.e. authorized a "vacation" - "rights of
access" as opposed to the "rights of custody".
It appears that the Greek court confused Petroutsa's rights of custody with
Despina's rights of access.  Pursuant to Hague Convention rights of
access only granted her the right to take the child for a "limited period of
time".  The recitation of the evidence is contradictory to the conclusions
in the order.
Since the Greek court admitted USA as the habitual residence, Article 13
required to find that Despina proved by "clear and convincing evidence"
that there was a grave risk of physical or psychological harm to THE
CHILD to return him - not Despina.  The Court was silent whether it
found that, but it's to the petitioner the burden and the burden is "clear
and convincing" - essentially, the equivalent of criminal burden.  Being
deprived of his mother's presence by being returned to his country of
habitual residence is not a "grave risk of ... psychological harm" as
required by the Hague.
She had "visitation" - and at one point joint custody - through the
California courts.  Therefore, the finding of the Greek Court under the
Article 13 exception fails and, therefore, is deficient.
The Court's order states his stay in Greece is not illegal - but it does not
make the required finding as to whether or not the REMOVAL and/or
RETENTION was wrongful under Article 3 of the Hague .

On 9th of December 2005 the Petitioner was granted by the First Instance
Court of Athens a temporary Order assigning the temporary custody of
the child to her.

This Temporary Order was not legally awarded to her as the service of
the telegram noticing the Hearing did not take place at the proper address
of Mr Petroutsas.

This Order was not extended by the Greek Judge at the designated Hearing of the injunction dated 9th of January 2006 because there was already in motion the Hague Convention procedure and so, the Greek Ministry of Justice sent a letter to the judge suggesting to him not to extend the Temporary Order, which would be against Art. 14 of the Hague Convention and to stay all the custody proceedings, until there should be a proceeding regarding the Hague convention application by the Greek Courts.

Actually, the Temporary Order for custody was granted to the petitioner **for the first time on the 23rd of April 2007,** when the First Instance Court of Athens under an injunctive measures procedure issued, by virtue of the Decision 3157/2007, an Order of temporary custody in favor of her and granted temporary visitation rights in favor of Mr Petroutsas, taking place in his own home in Greece.

Before the 23rd of April there was, actually, no regulation of the custody either by the Law or by a consent of the parties, despite the allegation in para.8 and para.4 of Mr Paraschos' Affidavits respectively.

The said temporary Order never affected the joint parental care exercised by both parents with regard to the child.

The single Member First Instance Court of Athens in the context of the ordinary procedure pursuant to the Decision 1733/2007 awarded the permanent custody to mother and dismissed her claim to get the exclusive permanent parental care by excluding father, being exercised jointly by

8

both parents, and also regulated the visitation rights of the father.

This Court Decision is to be appealed because the Greek Court ignored the pendency of the case in front of the Santa Cruz Court and its priority regarding the Greek Courts.

Last, but not least, the Petition with the Single Member First Instance Court of Pireaus of the respondent Mr Petroutsas for recognition and enforcement of the Santa Cruz Decision was dismissed, but the Appeal Court of Pireaus has accepted to reexamine the case, provided Mr Petroutsas as petitioner submits to the First Instance Court the Santa Cruz Decision FL 022605 along with the then expected Decision that actually took number 1733/2007, which is to be done shortly.

In conclusion, the Greek Courts paradoxically enough assume the jurisdiction of the whole case, but the issue is not the declaration of the Greek Courts, but the appropriate application of the conflict of Laws rules in a particular case, which is up to your honorable Court to decide.

I hereby certify that I fluently speak, read and write the English language.

I HEREBY CERTIFY UNDER THE PENALTIES OF PERJURY AND UPON PERSONAL KNOWLEDGE OF THE CONTENTS OF THE FOREGOING AFFIDAVIT ARE TRUE AND CORRECT.

9

I hereby authorize a facsimile or scanned copy of my signature affixed hereto to be deemed to have the same force and effect as the original.

Stilianos H. GRIGORIOU, Attorney-at-Law LLM

Case 5:07-cv-05535-JF   Document 54   Filed 12/10/2007   Page 34 of 71

## AFFIDAVIT OF GREEK ATTORNEY REGARDING
## MARCH 23 2006 HAGUE HEARING

I, Nineta Papadavid, Esquire, hereby depose and say as follows:

1.      I am over the age of eighteen (18). I am competent to be a witness, and I have
personal knowledge of the facts and matters stated in this Affidavit.

2.      I am a lawyer in good standing in Greece.

3.      I am qualified to interpret the laws of Greece.

4.      I was hired to serve as attorney for Mr. George Petroutsas from December 2005 thru
May 2006. Mr. Petroutsas filed his Hague Petition with the U.S. State Department
under the Hague Convention on the Civil Aspects of Child Abduction.

5.      In December 2005, The U.S. State Department Intern sent this petition to the Greek
Central Authority (Ministry of Justice), who then assigned a hearing date of March
23, 2006.

6.      On March 23, 2006, a Single Member Court of Piraeus heard the matter of The
People vs. Despina Asvesta (Judgment No. 5042/2006). At the time of the hearing, I
was Mr. Petroutsas' attorney and was presented to the court as such. I was
instructed that I was not allowed to speak on Mr. Petroutsas' behalf because the
Greek Minister of Justice had appointed a representative (Attorney Legal
Representative N.S.K. Anastasios Ralis) to serve as Mr. Petroutsas' representative at
the hearing. It was explained that as the case under his Hague petition was being
brought before the Greek courts by "The People" and not by Mr. Petroutsas as an
individual, he was not to be allowed individual counsel in this matter. This had not
been explained to myself or Mr. Petroutsas until very close to the Hague hearing.

1



7.  At the time of the hearing I had been Mr. Petroutsas' attorney for four months and had spent many hours preparing for this case but Mr. Rall was only permitted to speak on Mr. Petroutsas' behalf. Mr. Petroutsas was only allowed one witness. Mr. Rall spent no more than 45 minutes meeting with Mr. Petroutsas and his witness before the hearing. Mr. Rall told us he had briefly experienced one Hague hearing for Child Abduction prior to Mr. Petroutsas' case.

8.  At the hearing, a Court Clerk or Court Reporter was not present at any time. Mr. Petroutsas was not allowed to speak at the trial and was represented by Mr. Rall and by one witness allowed to speak on Mr. Petroutsas' behalf according to Greek Law.

9.  During my preparation for Mr. Petroutsas' hearing, I read several reports from the United States Department of State which listed that Greece was non-compliant with the Hague Convention (see attached reports). At the time of Mr. Petroutsas' trial and also when the official decision was handed down, I saw the following:

   a.  A hearing under the Hague Convention for Child Abduction should only determine where the habitual residence of the child was at the time of abduction. The Greek Court did not at any time mention or determine the habitual residence of the child as required by the Convention. Instead the Greek Court made a custody determination and did not discuss the merits of the Hague application for the child's return to the United States.

   b.  In the Judge's determination, she based her decision of custody on all of Ms. Asvesta's claims and acknowledged them as fact without any supporting evidence. The Judge did not take into account any testimony provided by Mr. Rall or by Mr. Petroutsas' witness to disprove Ms. Asvesta's claims. Ms.

2



Asvesta's and her witnesses claims were full of falsified statements that could easily have been disproven by the evidence we had provided to the Court, but the Judge did not record that any evidence was presented to counter Ms. Asvesta's claims.

c. Ms. Asvesta's claims included allegations of neglect and abuse and also that Mr. Petroutsas was not exercising custody at the time she took the child to Greece. Ms. Asvesta did not provide any evidence of abuse or mistreatment. Mr. Petroutsas provided evidence to show that they were living as a family in California at the time Ms. Asvesta took the child to Greece and refused to return, but this was not entered into the Court record.

d. The Judge _____ determined that since Mr. Petroutsas had given written permission for Ms. Asvesta to travel to Greece there was no abduction. The Judge did not consider that Ms. Asvesta's refusal to return to the United States was also considered abduction under the terms of the Hague Convention on the Civil Aspects of Child Abduction.

10. After the hearing on March 23, 2006, the Judge provided a decision based on handwritten notes according to Greek Law. In August of 2006, over five months after the hearing in Greece, the Judge's official decision was recorded, by then the time for appeal of Mr. Petroutsas' case had elapsed. Mr. Petroutsas had protested to the Central Authority of the United States and has been granted a new opportunity to appeal this decision.

11. I hereby certify that I fluently speak, read and write the English language.

3



I HEREBY CERTIFY UNDER THE PENALTIES OF PERJURY AND UPON

PERSONAL KNOWLEDGE OF THE CONTENTS OF THE FOREGOING AFFIDAVIT ARE

TRUE AND CORRECT.

Atheus the 11th December 2007

Nineta Papadavid, Esquire

4

B J Fadem, Esquire,  Bar #118819
LAW OFFICES OF B J FADEM, APC
255 N. Market Street,  Suite 210
San Jose, California  95110
408-280-1220 (voice)
408-292-4100 (fax)
fademlaw@sbcglobal.net

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF CALIFORNIA
### San Jose Division

DESPINA ASVESTA,
22 Platonos Street
Nikaia, 18454
Piraeus, Greece

        Petitioner

   v.

GEORGE PETROUTSAS
300 Plum Street, SPC 69
Capitola, California  95010

        Respondent

_____/

Case No.  C 07 05535 JF

**AFFIDAVIT OF**
**BESSIE P. PETROUTSAS**

I, BESSIE P. PETROUTSAS, do declare:

1. I hereby make this affidavit from my own personal knowledge and if asked to

   testify in any court of law would testify as set forth below.

2. I am George Petroutsas's younger sister.  I have known George my entire life and

   have known Despina Asvesta for about seven years.

3. At the time of Andoni's abduction and Despina's refusal to return from Greece,

   George and Despina had lived in Capitola, California and were both exercising

Affidavit of
Bessie P. Petroutsas
C-07-05535 JF

custody as a family in the same home. George was highly involved in Despina's pregnancy, attending all Doctor's appointments and taking paternity leave from work to care for Andoni and Despina after childbirth. George continued in this caring manner throughout Andoni's life in the U.S. and in any manner, however difficult it was made for him, while Despina kept Andoni in Greece.

4. From November 3-6, 2005, George traveled to New York to attend a family engagement and brought Andoni with him. Despina stayed at home in California as she never expressed a warmth or interest in sharing with our family. This was the first time I was able to meet Andoni who was now six months old as Despina did not want any of our family members staying in "her" home or visiting.

5. During the New York trip, I was in awe of my brother and his fathering skills. He cared for Andoni in every way and was a model parent. Although my sister and I were both at hand, George did not once ask or need our help with a feeding, changing or bathing of Andoni. The day after George returned to California, Despina took Andoni to Greece and refused to return as agreed and scheduled.

6. On or about November 13, 2005, after Despina had left with Andoni, I flew to California to stay with my brother. During this time, we received news of our grandfather's death in Greece. We received a phone call from a close family member who attended the funeral. She told George that at the funeral, Despina pulled her to the side saying Despina had returned to Greece as she was unhappy in the U.S., no longer loved George and that she was never going back. This was a surprise to George.

Affidavit of
Bessie P. Petroutsas
C-07-05535 JF

7. George phoned Despina in my presence to ask her about what she had said. She told him she was confused and was working on finding psychiatric help but wouldn't share with him why she needed to seek help. Also at this time, Despina repeatedly asked George to mail to her Andoni's Greek passport. She had applied for it before she left for Greece but it hadn't arrived in time before her trip. She claimed that without a Greek passport, Andoni couldn't get health insurance. George became highly suspicious as we knew this wasn't true.

8. On November 18, 2005, I was with George when he phoned Despina and was told that, unless he was moving to Greece, she was leaving him, she also refused to return. From that day, whenever George tried to speak with Despina her brother, father or uncle would grab the phone and verbally berate my brother. They were threatening, highly vulgar and very abusive. During this time, Despina's family phoned my brother directly at all hours in the night to make threats against him. At my insistence, George began recording all telephone calls from his phone as we feared for his safety and didn't know what to expect from Despina and her family.

9. Due to Despina's errant behavior and the increasingly stressful situation, I extended my stay in California to help my brother in any way I could. On November 27, 2005, I was assisting my brother with his online banking and noticed suspicious activity on his bank account. Despina had attempted over 38 ATM withdrawals in Greece in a matter of 4 days. (See attached Exhibit A).

10. As a result of Despina's erratic behavior and in concern for my Andoni's safety, George and I visited the law offices of Mitchell Page on November 29, 2005. As

Affidavit of
Bessie P. Petroutsas
C-07-05535 JF

a parent, George always had Andoni's best interest at the forefront of all of his actions. Despina refused to tell George why she needed psychiatric help, he was confused as to why she refused to speak to him, why she was desperate to have Andoni's passport and as she had attempted to withdraw so much money from the bank account when he had already given her cash to take on the trip. George told me he was afraid of making any moves that would permanently damage his marriage with Despina but that he had to have Andoni's safety as a priority and that included being able to provide for his family before Despina pulled out all of their savings from the bank account. At this time, as a direct result of Despina's actions and in Andoni's best interest, George filed for custody of Andoni and reluctantly filed for divorce.

11. The following month, in December 2005, I visited my grandmother in Greece for the Holidays as my grandfather had just passed away. On this trip, I phoned Despina and asked if she would possibly bring Andoni over so we could give a gift and visit for Christmas as, at eighty years old, my grandmother does not leave the house. Despina refused and hung up the phone. Later that day, Despina's brother phoned me and was violently yelling at me. He said that we would never see Andoni again. His words to me were "I'm paying for the diapers now, that makes me Andoni's father, and as his father, I say where he can and cannot go! I'm the father now...you tell your brother I'm the father now!" When I asked him to think of my grandmother and not me, his response was "tell the old lady she can climb up the stairs if she wants to see him". This was in reference to their home as it is a third floor walk up.

12. On December 25, 2005, completely unannounced, Despina's mother rang our doorbell with Andoni in her arms and Despina's brother guarding my grandmother's front door. We were not allowed to hold or touch Andoni. Despina's brother searched the home to see if George was there. They asked if George was in Greece and then left within 20 minutes. That was the last time I was allowed to see Andoni in nearly two years until George brought him back home.

13. Over the course of this custody battle, Despina has accused George of numerous things without proof or merit and that are completely fabricated. George has never had the opportunity to properly defend himself against her accusations and also has never slandered her in any court proceeding nor in any private arena. George is adamant that no one in our family will criticize or speak badly about Andoni's mother.

14. George continues to maintain that he will always do his utmost to allow Despina supervised visitation with Andoni and will make sure she is a part of his life. I have witnessed numerous occasions where Despina has foregone calling Andoni at her scheduled time and has allowed weeks to pass without communicating with Andoni.

15. In the time Andoni has been with George, I have witnessed George teaching Andoni words in English (including "Mommy") and continuing his vocabulary in Greek. I have observed George showing Andoni photos of Despina and her family and repeating their names so that he will learn and have connection to them.

Affidavit of
Bessie P. Petroutsas
C-07-05535 JF

16. I strongly believe that if George maintains sole custody of Andoni he will do the utmost to keep a balanced family life and will always welcome Despina in Andoni's life. I do not believe this is the same for Despina as we witnessed during the time in which she kept Andoni in Greece.

*B. Petroutsas*

Bessie P. Petroutsas, Esq.

EXHIBIT A

REF:0000348022121211082500200532207904970511232

| Date | Description | | | |
|---|---|---|---|---|
| 11/23/2005 | DEPOSIT | | $4,426.50 | $4,439.95 |
| 11/21/2005 | NON-BANK CARD ATM FEE ON 11-21 #000763431 CUSTOMER 2566 AT TERMINAL N8019802 N.B.O.G. DIMOKRATIAS BRANC PEIRAIAS | $1.50 | | $14.46 |
| 11/21/2005 | NON-BANK CARD ATM FEE ON 11-21 #000763420 CUSTOMER 2566 AT TERMINAL N8019802 N.B.O.G. DIMOKRATIAS BRANC PEIRAIAS | $1.50 | | $15.96 |
| 11/21/2005 | NON-BANK CARD ATM FEE ON 11-21 #000488944 CUSTOMER 2566 AT TERMINAL S1AX107A EMPORIKI BANK GR. LAMPRAKI PEIRAIAS | $2.00 | | $17.46 |
| 11/21/2005 | ORCHARD SUPPLY 11-20 CUSTOMER 1046 PURCHASE #030450 AAPITOLA CA | $23.24 | | $19.46 |
| 11/21/2005 | ORCHARD SUPPLY 11-20 CUSTOMER 1046 PURCHASE #331382 AAPITOLA CA | $40.08 | | $42.70 |
| 11/21/2005 | EL PALOMAR RESTAURANT 11/17 CARD #1046 PURCHASE #247170553227333281092990 SANTA CRUZ, CA | $48.30 | | $82.78 |
| 11/21/2005 | NOB HILL #615 11-21 CUSTOMER 1046 PURCHASE #637379 CAPITOLA CA | $100.73 | | $129.08 |
| 11/15/2005 | INSUFFICIENT FUNDS FEE | $68.00 | | $229.81 |
| 11/15/2005 | DEPOSIT | | $133.96 | $297.81 |
| 11/15/2005 | DEPOSIT | | $208.19 | $163.83 |
| 11/14/2005 | SAFEWAY STORE 11-14 CUSTOMER 1046 PURCHASE #394004 APTOS CA | $28.22 | | -$44.36 |
| 11/14/2005 | CHECK #900 | $130.00 | | -$16.14 |
| 11/10/2005 | AMPCO SYSTEM PARKING SA 11/08 CARD #1046 PURCHASE #2441600531331310601333307 SAN FRANCISCO, CA | $59.00 | | $113.86 |
| 11/10/2005 | INSUFFICIENT FUNDS FEE | $138.00 | | $122.86 |
| 11/10/2005 | DFAS-CLEVELAND DES:FED SALARY ID:611337821 INDN:PETROUTSAS DESPINA A CO ID:3041036004 PPD REF:0000348022121211082500200531131917720511022 | | $1,069.21 | $258.86 |
| 11/09/2005 | WLI*RESERVATIONREWARDS. 11/07 CARD #2566 PURCHASE #241420953129781105461B5 800-7327031, CT | $7.00 | | -$800.35 |
| 11/09/2005 | AIR FRANCE 05727062657 11/06 CARD #2566 PURCHASE #249094653130900011160854 NEW YORK, NY | $15.00 | | -$793.35 |
| 11/09/2005 | YOSEMITE LIQUO 11-09 CUSTOMER 1046 PURCHASE #003843 MARIPOSA CA | $37.22 | | -$778.35 |
| 11/09/2005 | AIR FRANCE 05721499780 11/06 CARD #2566 PURCHASE #249094653130900011160847 NEW YORK, NY | $370.70 | | -$741.13 |
| 11/09/2005 | INSUFFICIENT FUNDS FEE | $68.00 | | -$370.43 |
| 11/08/2005 | CHECK #895 | $12.03 | | -$302.43 |
| 11/08/2005 | SAFEWAY STORE 11-08 CUSTOMER 1046 PURCHASE #390002 APTOS CA | $28.22 | | -$290.40 |
| 11/08/2005 | INSUFFICIENT FUNDS FEE | $170.00 | | -$262.18 |
| 11/07/2005 | CASH TRANSFER | | $550.00 | -$92.18 |
| 11/07/2005 | AIR FRANCE 05727062679 11/03 CARD #2566 TORONTO, QC PURCHASE FOREIGN CURRENCY CONVERSION FEE #745470653107029599433 | $1.65 | | -$642.18 |
| | AIR FRANCE 05721134196 11/03 CARD #2566 | | | |

| | | | |
|---|---|---|---|
| greece | 11/25/2005 | CUSTOMER 2566 AT TERMINAL S1B10801 404255 PIRAEUS BANK ATHENS | $5.00 | $3,616.37 |
| greece | 11/25/2005 | NON-BANK CARD ATM FEE ON 11-25 #000015734 CUSTOMER 2566 AT TERMINAL 4406 AGRICULT. BANK 0622-PEIREAS B AGRICULT. BAN | $5.00 | $3,621.37 |
| | 11/25/2005 | CAFE CRUZ 11/23 CARD #1046 PURCHASE #24717055327733279844985 SOQUEL, CA | $98.83 | $3,626.37 |
| greece | 11/25/2005 | 404255 ATM WITHDRWL 11-24 #000105412 CUSTOMER 2566 PIRAEUS BANK ATHENS | $118.07 | $3,723.20 |
| | 11/25/2005 | 404255 ATM WITHDRWL 11-25 #000105204 CUSTOMER 2566 PIRAEUS BANK ATHENS | $354.21 | $3,841.27 |
| | 11/25/2005 | AGRICULT. B ATM WITHDRWL 11-25 #000015734 CUSTOMER 2566 0622-PEIREAS B AGRICULT. BAN | $471.88 | $4,195.48 |
| | 11/23/2005 | NON-BANK CARD ATM FEE ON 11-23 #000363713 CUSTOMER 2566 AT TERMINAL 00007001 Citibank Greec 18451/258 PetrouR Nikaia | $1.50 | $4,667.16 |
| | 11/23/2005 | NON-BANK CARD ATM FEE ON 11-23 #000363706 CUSTOMER 2566 AT TERMINAL 00007001 Citibank Greec 18451/258 PetrouR Nikaia | $1.50 | $4,668.66 |
| | 11/23/2005 | NON-BANK CARD ATM FEE ON 11-23 #000363699 CUSTOMER 2566 AT TERMINAL 00007001 Citibank Greec 18451/258 PetrouR Nikaia | $1.50 | $4,670.16 |
| | 11/23/2005 | NON-BANK CARD ATM FEE ON 11-23 #000363693 CUSTOMER 2566 AT TERMINAL 00007001 Citibank Greec 18451/258 PetrouR Nikaia | $1.50 | $4,671.66 |
| | 11/23/2005 | NON-BANK CARD ATM FEE ON 11-23 #000363680 CUSTOMER 2566 AT TERMINAL 00007001 Citibank Greec 18451/258 PetrouR Nikaia | $1.50 | $4,673.16 |
| | 11/23/2005 | NON-BANK CARD ATM FEE ON 11-23 #000363671 CUSTOMER 2566 AT TERMINAL 00007001 Citibank Greec 18451/258 PetrouR Nikaia | $1.50 | $4,674.66 |
| | 11/23/2005 | NON-BANK CARD ATM FEE ON 11-23 #000013827 CUSTOMER 2566 AT TERMINAL S1AX855A TA TA - PETROU RALLI KAIA | $1.50 | $4,676.16 |
| | 11/23/2005 | NON-BANK CARD ATM FEE ON 11-23 #000013815 CUSTOMER 2566 AT TERMINAL 4146 AGRICULT. BANK 1421-NIKAIA ATTIKH | $1.50 | $4,677.66 |
| | 11/23/2005 | NON-BANK CARD ATM FEE ON 11-23 #000013800 CUSTOMER 2566 AT TERMINAL A047 000000047 LAIKI 047-PETROYR NIKAIA | $1.50 | $4,679.16 |
| | 11/23/2005 | NON-BANK CARD ATM FEE ON 11-23 #000013791 CUSTOMER 2566 AT TERMINAL A124TTW1 124 NIKEAS ATHENS | $1.50 | $4,680.66 |
| | 11/23/2005 | NON-BANK CARD ATM FEE ON 11-23 #000013724 CUSTOMER 2566 AT TERMINAL SOB00801 000000008 OMEGA BANK NIKAIA | $1.50 | $4,682.16 |
| | 11/23/2005 | NON-BANK CARD ATM FEE ON 11-23 #000013711 CUSTOMER 2566 AT TERMINAL SOB00801 000000008 OMEGA BANK NIKAIA | $1.50 | $4,683.66 |
| | 11/23/2005 | Citibank Greec ATM WITHDRWL 11-23 #000363657 CUSTOMER 2566 18451/258 PetrouR Nikaia | $4.70 | $4,685.16 |
| | 11/23/2005 | NON-BANK CARD ATM FEE ON 11-23 #000363657 CUSTOMER 2566 AT TERMINAL 00007001 Citibank Greec 18451/258 PetrouR Nikaia | $5.00 | $4,689.86 |
| | 11/23/2005 | APTOS VILLAGE CLEANERS 11/21 CARD #1046 PURCHASE #24236275328403250010151 APTOS, CA | $14.55 | $4,694.86 |
| | 11/23/2005 | Citibank Gr ATM WITHDRWL 11-23 #000363657 CUSTOMER 2566 18451/258 PetrouR Nikaia | $470.23 | $4,709.41 |
| | 11/23/2005 | DFAS-CLEVELAND DES:FED SALARY ID:611337621 INDN:PETROUTSAS DESPINA A CO ID:3041036004 PPD | $739.88 | $5,179.64 |

ATM WITHDRAWALS

**SPITI**

close window

print window

Transaction Period Ending 11/30/2005

Posted Transactions

| Posting Date | Transaction | Debit(-) | Credit(+) | Balance |
|---|---|---|---|---|
| 11/30/2005 | ACCOUNT FEES | $20.00 | | $2,782.44 |
| 11/30/2005 | INTEREST PAID FROM 11/01/05 THROUGH 11/30/05 | | $0.10 | $2,802.44 |
| 11/28/2005 | Citibank Greec ATM WITHDRWL 11-28 #000038475 CUSTOMER 2566 18451/258 PetrouR Nikais | $4.70 | | $2,802.34 |
| 11/28/2005 | NON-BANK CARD ATM FEE ON 11-28 #000038475 CUSTOMER 2566 AT TERMINAL 00007001 Citibank Greec 18451/258 PetrouR Nikaia | $5.00 | | $2,807.04 |
| 11/28/2005 | RITE AID #5985 11-27 CUSTOMER 1046 PURCHASE #819441 APTOS CA | $6.47 | | $2,812.04 |
| 11/28/2005 | BK OF AM CRD ACH DES:PAYBYPHONE ID:PETROUT8AS INDN:4024112005962359001500 CO ID:3001190310 PPD REF:0000346021212110825002008332592135105112827 | $301.32 | | $2,818.51 |
| 11/28/2005 | Citibank Gr ATM WITHDRWL 11-28 #000038475 CUSTOMER 2566 18451/258 PetrouR Nikaia | $469.60 | | $3,119.83 |
| 11/25/2005 | 404255 ATM WITHDRWL 11-24 #000108412 CUSTOMER 2566 PIRAEUS BANK ATHENS | $1.18 | | $3,589.43 |
| 11/25/2005 | NON-BANK CARD ATM FEE ON 11-24 #000108758 CUSTOMER 2566 AT TERMINAL S1B10601 404255 PIRAEUS BANK ATHENS | $1.50 | | $3,590.61 |
| 11/25/2005 | NON-BANK CARD ATM FEE ON 11-24 #000108104 CUSTOMER 2566 AT TERMINAL S1B10601 404255 PIRAEUS BANK ATHENS | $1.50 | | $3,592.11 |
| 11/25/2005 | NON-BANK CARD ATM FEE ON 11-28 #000015709 CUSTOMER 2566 AT TERMINAL 4405 AGRICULT. BANK 0822-PEIREAS B AGRICULT. BAN | $1.50 | | $3,593.61 |
| 11/25/2005 | NON-BANK CARD ATM FEE ON 11-24 #000798954 CUSTOMER 2566 AT TERMINAL NB008801 N.B.O.G. KAT/MA PERIVOLAKI PEIRAIAS | $1.50 | | $3,595.11 |
| 11/25/2005 | NON-BANK CARD ATM FEE ON 11-24 #000798952 CUSTOMER 2566 AT TERMINAL NB008801 N.B.O.G. KAT/MA PERIVOLAKI PEIRAIAS | $1.50 | | $3,596.61 |
| 11/25/2005 | NON-BANK CARD ATM FEE ON 11-24 #000798947 CUSTOMER 2566 AT TERMINAL NB008801 N.B.O.G. KAT/MA PERIVOLAKI PEIRAIAS | $1.50 | | $3,598.11 |
| 11/25/2005 | NON-BANK CARD ATM FEE ON 11-24 #000798945 CUSTOMER 2566 AT TERMINAL NB008801 N.B.O.G. KAT/MA PERIVOLAKI PEIRAIAS | $1.50 | | $3,599.61 |
| 11/25/2005 | NON-BANK CARD ATM FEE ON 11-24 #000108627 CUSTOMER 2566 AT TERMINAL S1B10601 404255 PIRAEUS BANK ATHENS | $2.00 | | $3,601.11 |
| 11/25/2005 | 404255 ATM WITHDRWL 11-24 #000108204 CUSTOMER 2566 PIRAEUS BANK ATHENS | $3.54 | | $3,603.11 |
| 11/25/2005 | AGRICULT. BANK ATM WITHDRWL 11-25 #000015734 CUSTOMER 2566 0822-PEIREAS B AGRICULT. BAN | $4.72 | | $3,606.65 |
| 11/25/2005 | NON-BANK CARD ATM FEE ON 11-24 #000108412 CUSTOMER 2566 AT TERMINAL S1B10601 404255 PIRAEUS BANK ATHENS | $5.00 | | $3,611.37 |
| | NON-BANK CARD ATM FEE ON 11-24 #000108204 | | | |

| Date | Description | Amount | Balance |
|---|---|---|---|
| 12/05/2005 | ADT/ALERT CENTRE DES:PAYMENT ID:000000004912705 INDN:GEORGE PETROUTSAS CO ID:4651136816 PPD REF:0000348022121211082500200533901926B005120527 | $34.28 | $1,267.46 |
| 12/05/2005 | CHECK #902 | $65.50 | $1,233.20 |
| 12/05/2005 | Bay Federal DES:Fnds Trf/R ID:123755 INDN:George Petroutsas CO ID: 321177708 PPD REF:0000348022121211082500200533924113980S120527 | $175.00 | $1,167.70 |
| 12/05/2005 | EUROBANK ATM WITHDRWL 12-03 #000359560 CUSTOMER 2566 CARREFOUR RENTI PIREAUS | $187.26 | -$992.70 |
| 12/05/2005 | Bay Federal DES:Fnds Trf/R ID:123755 INDN:George Petroutsas CO ID: 321177708 PPD REF:0000348022121211082500200533924113980S120527 | $284.00 | -$805.44 |
| 12/05/2005 | EUROBANK ATM WITHDRWL 12-03 #000359539 CUSTOMER 2566 CARREFOUR RENTI PIREAUS | $327.71 | -$521.44 |
| 12/05/2005 | AMERICAN EXPRESS DES:CHECK PYMT ID:905 INDN:00008300 192 00000 CO ID:9222320021 ARC REF:0000348022121211082500200533901751590S120527 | $1,613.04 | -$193.73 |
| 12/02/2005 | CHECK #908 | $49.00 | $1,419.31 |
| 12/02/2005 | CHECK #904 | $672.09 | $1,468.31 |
| 12/01/2005 | CHECK #910 | $100.00 | $2,040.40 |
| 12/01/2005 | CHECK #906 | $135.00 | $2,140.40 |
| 12/01/2005 | CHECK #907 | $246.99 | $2,275.40 |
| 12/01/2005 | CHECK #912 | $259.05 | $2,523.39 |
| | Beginning Balance as of 12/01/2005 | | $2,782.44 |

Please close window when you've finished printing. This page will timeout and close automatically in 10 minutes.

🔒 **Secure Area**

Bank of America, N.A. Member FDIC. Equal Housing Lender 🏠
©2006 Bank of America Corporation. All rights reserved.



close window

print window

**SPITI**

**Transaction Period Ending 12/30/2005**

**Posted Transactions**

| Posting Date | Transaction | Debit(-) | Credit(+) | Balance |
|---|---|---|---|---|
| 12/30/2005 | ACCOUNT FEES | $20.00 | | $567.92 |
| 12/30/2005 | INTEREST PAID FROM 12/01/05 THROUGH 12/30/05 | | $0.07 | $587.92 |
| 12/29/2005 | CHECK #921 | $100.00 | | $587.85 |
| 12/29/2005 | CHECK #922 | $401.39 | | $887.85 |
| 12/28/2005 | CHECK #917 | $68.00 | | $1,089.18 |
| 12/27/2005 | SEARS PAYMENT DES:CHECK PYMT ID:0918 INDN:19842898CB019754 CO ID:CITI SEARS ARC REF:0000348022121211082500200538717972350512272727 | $50.39 | | $1,157.18 |
| 12/27/2005 | CHECK #920 | $200.00 | | $1,207.57 |
| 12/27/2005 | AMERICAN EXPRESS DES:CHECKPAYMT ID:0919 INDN:200512238302950 CO ID:AMEXARCRLA ARC REF:0000348022121211082500200539610200048505122727 | $300.00 | | $1,407.57 |
| 12/23/2005 | THE HEALTHY WAY 12/20 CARD #1046 PURCHASE #24286986355980008114909 SANTA CRUZ, CA | $19.95 | | $1,707.57 |
| 12/23/2005 | CHECK #915 | $26.42 | | $1,727.52 |
| 12/23/2005 | CHECK #916 | $118.24 | | $1,753.94 |
| 12/21/2005 | PUBLIX 12-21 CUSTOMER 1046 PURCHASE #001211 PALM BEACH GA FL | $105.30 | | $1,870.18 |
| 12/20/2005 | DEPOSIT | | $38.01 | $1,975.48 |
| 12/20/2005 | DEPOSIT | | $1,500.00 | $1,937.47 |
| 12/14/2005 | NOB HILL #615 12-13 CUSTOMER 1046 PURCHASE #571045 CAPITOLA CA | $104.48 | | $437.47 |
| 12/12/2005 | ATM/CHECK CARD PURCHASE DEBIT ON 12/07/05 CARD # 4217858946212688 CLAIM #1782912DEC05 WLI*RESERVATIONREWARDS 800-7327031 | $7.00 | | $541.95 |
| 12/07/2005 | CHECK #911 | $28.42 | | $548.95 |
| 12/08/2005 | CHECK #913 | $26.00 | | $575.37 |
| 12/06/2005 | CHECK #909 | $146.00 | | $601.37 |
| 12/08/2005 | INSUFFICIENT FUNDS FEE | $170.00 | | $747.37 |
| 12/08/2005 | DEPOSIT | | $2,000.00 | $917.37 |
| 12/05/2005 | CASH TRANSFER | | $200.00 | $1,082.63 |
| 12/05/2005 | EUROBANK ATM WITHDRWL 12-03 #000359560 CUSTOMER 2566 CARREFOUR RENTI PIREAUS | $1.87 | | $1,282.63 |
| 12/05/2005 | EUROBANK ATM WITHDRWL 12-03 #000359539 CUSTOMER 2566 CARREFOUR RENTI PIREAUS | $3.28 | | $1,280.76 |
| 12/05/2005 | NON-BANK CARD ATM FEE ON 12-03 #000359560 CUSTOMER 2566 AT TERMINAL 81A00172 EUROBANK CARREFOUR RENTI PIREAUS | $5.00 | | $1,277.48 |
| 12/05/2005 | NON-BANK CARD ATM FEE ON 12-03 #000359539 CUSTOMER 2566 AT TERMINAL 81A00172 EUROBANK CARREFOUR RENTI PIREAUS | $5.00 | | $1,272.48 |

*greece ATM withdrawals* (handwritten annotation)

# CERTIFICATE OF ACKNOWLEDGEMENT

STATE OF FLORIDA
COUNTY OF BROWARD

The foregoing instrument, Affidavit of Bessie P. Petroutsas, was acknowledged before me this tenth day of December, 2007, by Ilyse Levine-Jennings, Notary Public, State of Florida.

ILYSE LEVINE-JENNINGS
Notary Public - State of Florida
My Commission Expires Jan 23, 2010
Commission # DD 509897
Bonded By National Notary Assn.

12 - 10 - 07       Ilyse Levine-Jennings
Notary Public - State of Florida

(seal)

Personally Known ___X___ OR Produced Identification _____
Type of Identification Produced_____

Affidavit of
Bessie P. Petroutsas
C-07-05535 JF

B J Fadem, Esquire, Bar #118819
LAW OFFICES OF B J FADEM, APC
255 N. Market Street, Suite 210
San Jose, California 95110
408-280-1220 (voice)
408-292-4100 (fax)
fademlaw@sbcglobal.net

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF CALIFORNIA
San Jose Division

DESPINA ASVESTA,
22 Platonos Street
Nikaia, 18454
Piraeus, Greece

   Petitioner

  Case No. C 07 05535 JF

  v.

GEORGE PETROUTSAS
300 Plum Street, SPC 69
Capitola, California 95010

  AFFIDAVIT OF
  CLAUDIA MORALES

   Respondent

_____/

  I, CLAUDIA MORALES, do declare:

1. I hereby make this affidavit from my own personal knowledge and if asked to testify in any court of law would testify as set forth below.

2. I have known George Petroutsas since I was ten (10) years old.  I met Despina Asvesta in December of 2000.  George and Despina are the godparents of my first child.

3. To say George wasn't "exercising his custody" of their child before Despina left is the farthest from the truth.  George was involved throughout Despina's pregnancy and when their child was born, George was present at the delivery and

- 1 -

extremely active in his care as a father. In fact, Despina admitted to me that George was extremely supportive to her during the delivery. Despina also admitted to me that George was an "excellent father". In fact, she said she couldn't have chosen a better father for their child.

4. Despina confided in me about her marital issues. When she left for Greece in November 2005, she continued to maintain communication with me by e-mail. **[Attached hereto as Exhibit 1 are true and genuine copies of the e-mails I received from Despina from Greece]** At no time before she left for Greece, nor while she was in Greece, did Despina make the accusations against George that she claimed later for "legal purposes".Despina complained that she was depressed and needed to see a professional in Greece; despite the fact that George found someone extremely competent in Los Angeles and he would arrange for her to go. She insisted on going to Greece. George only agreed to one (1) month. In fact, it was my understanding that Despina's mother was to return with her and the baby in December 2005 to spend the winter months with them. It wasn't until Despina got to Greece that her main complaint was she didn't want to live in the United States any longer. Despina complained that she missed her parents. As I stated earlier, they are my first daughter's godparents, and it was my understanding that we were planning on raising our families together so it was surprising to me that she began to talk about them going back to Greece to live. She said it was because she missed her parents, but I always argued with her that although my parents and I lived in close proximity to each other, she really spent more time with her parents overall since her and George always went to Greece every year

for the month of August and her parents came to stay with them in the States all Winter, usually from November to March or even later. I always thought that was so generous and accommodating of George to be OK with living with his in-laws several months out of the year, but he did it because he loved and respected Despina and her family.

5. Despina has accused George of things he has not done and twisted information to make it seem like he is an unfit father.

6. We continue to see George and the baby almost daily. George takes care of every need and is very close to their son.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed this ___7th___ day of December, 2007 at ___San Jose___, California.

_Claudia D. Morales_
Claudia Morales



## ACKNOWLEDGMENT

State of California            )
County of Santa Clara          )

   On December 7, 2007, before me, E. Manassau, Notary Public, personally
appeared Claudia Morales, who proved to me on the basis of satisfactory
evidence to be the person whose name is subscribed to the within instrument
and acknowledged to me that she executed the same in her authorized capacity,
and that by her signature on the instrument the person, or the entity upon behalf
of which the person acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California
that the foregoing is true and correct.

   WITNESS my hand and official seal.

Signature

E. MANASSAU
COMM. # 1698972
NOTARY PUBLIC - CALIFORNIA
SANTA CLARA COUNTY
MY COMM. EXP. OCT. 15, 2010

AT&T Yahoo! Mail - fademlaw@sbcglobal.net    Page 1 of 2

Case 5:07-cv-03535-JF    Document 54    Filed 12/10/2007    Page 57 of 71


**YAHOO! MAIL** Classic

Print - Close Window

**From:** "Claudia Morales" <c_moraleswhite@hotmail.com>

**To:** "BJ Fadem" <fademlaw@sbcglobal.net>

**Subject:** FW: A letter to Claudia

**Date:** Thu, 6 Dec 2007 15:39:21 -0800

---

Date: Thu, 19 Jan 2006 01:27:18 -0800
From: dasvesta@yahoo.com
Subject: A letter to Claudia
To: c_moraleswhite@hotmail.com

My dear friends,
I know that any day now you are expecting the new member of your family. If she has already arrived, hug her for me and give her all my love. Please do the same for Maria.
The reason why I'm writing is because I owe you an explanation.
The reason why I did not return is that while I was here I found out that George had been cheating on me. This summer, while we were in Greece visiting with my parents, his secretary Jessie was stripping every night for him over the Internet, in front of a web cam. My brother and cousin saw that and my cousin, because he was sick of what George was doing, videotaped a segment of 20 sec. She was using a plastic pinis and was doing oral sex for him. I saw it early December.
Two weeks ago, I GOT RECEIPTS IN MY HANDS, of a hotel George stayed for three nights with his greek girlfriend. Claudia, George reunited with Sophia. The receipts that I have attached show that the mailing address that they had given is Sophias. He left me three days in Zakynthos with the baby and spent over $1000 for three days with her. You know how we had been financially and you know how our sex life had been.
So, return to what? To a husband who was cheating on me? Return to what house, what family? If he was man enough he would have told me that he got bored and tired of me. Instead he used me. He deprived me of love and happiness, he started beeing violent to me, using bad words. Why? Is that the family I deserve, the man I left everything to be with? What would you have done Claudia? If I returned, California law would make me stay there until the baby is 12. Why is he accusing me of child abduction? I travelled with his written permission, he took me to the airport. The very next day I was in Greece I saw a therapist because you know how I felt. He was blaming me for our love life! He was saying that I had changed and was the one that pushed him to a violent behavior. And he was cheating on me Claudia, with that Jessie and Sophia. Imagine how Cathy would feel..I strongly believe that she is helping me now. To get those receipts I needed a DA's order. I got them with a simple phone call. Is that luck or God? And there is more to that. George is going to be proceuted for something here in Greece. I cannot tell you, but he will be served the papers very soon.
I thought I owed you an explanation. I know that by not coming back I deprive you of Andonis. He has deprived me of my life. I feel raped emotionally. Yet, for the sake of my baby, I want him to continue seeing Andonis. He is his father and regardless of how he abused me, Andonis needs his father. I will not deny him of any communication, but he cannot have the audacity to be asking for child custody and deprive me of my baby. He knows that America will give me custody, but I will need to return. If I return I won't be able to leave. Would you return Claudia?

---

Yahoo! Photos
Got holiday prints? See all the ways to get quality prints in your hands ASAP.

---

You keep typing, we keep giving. Download Messenger and join the i'm Initiative now. Join in!

**Attachments**

**Files:**

📎 **OTE.doc** (40k) [Preview]

**Photos:**



**Lagonisi_p.1.jpg** (951k) [View]



**Lagonisi_p._2.jpg** (698k) [View]



**Lagonisi_p._3.jpg** (179k) [View]

B J Fadem, Esquire, Bar #118819
LAW OFFICES OF B J FADEM, APC
255 N. Market Street, Suite 210
San Jose, California 95110
408-280-1220 (voice)
408-292-4100 (fax)
fademlaw@sbcglobal.net

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF CALIFORNIA
### San Jose Division

DESPINA ASVESTA,
22 Platonos Street
Nikaia, 18454
Piraeus, Greece

        Petitioner

   v.

GEORGE PETROUTSAS
300 Plum Street, SPC 69
Capitola, California 95010

        Respondent

_____/

Case No.  C 07 05535 JF

AFFIDAVIT OF
DIONYSIS HELIOTIS

I, DIONYSIS, HELIOTIS, do declare:

1. I have known George Petroutsas closely since 1981 when I moved to the United States. Previously, I knew of him since our families go back at least 3 generations that I am aware of. My father and George's grandfather were good friends.

2. I met Despina Asvesta when she came to the US to visit George. Ms Asvesta was very excited about her future here in the US. I find it interesting how now she only talks about how she hated it here. She had gotten a job at the Monterey Language Institute and started working on her MBA. She was thrilled about that.

Asvesta vs. Petroutsas
C 07 05535 JF

    - 1 -

Affidavit of Dionysis Heliotis

When she became pregnant everyone was very excited for both of them. I knew George was going to be a great father to his kids.

3. They all left for summer vacation in Greece that summer; also I'm sure to show her family how sweet the little guy was.

4. One of the things that didn't seem right at the time was that Andonaki was 2-3 months old, they went for summer vacation and Ms Asvesta made a big deal about "registering"(getting him a "Merida" as they say in Greece) Andonaki in Greece. At the time, it seemed real strange to me that they would do that, it takes a lot of time and effort to get that done, you have to travel to specific places, deal with a bureaucracy, all this when you are there to relax and have fun. My oldest son, Niko, at the time was 9 ~~months~~ years of old and I still hadn't registered him. What's the big deal, we'd get to it. When I questioned George about that he said that it was a big deal to Despina for Andonaki to "registered" in Greece. They came back from their summer vacation.

5. By the time Andonaki was a few months old, I got very concerned for George. Whenever I talked to him (a few times a week), he sounded very tired. Every time we'd see him, he looked tired. He started having dark circles around his eyes. I'd ask him what was going on and he'd tell me that Andonaki was up several times during the night (he fed him a couple of times a night and then he had to change his diapers) and he didn't get any sleep. So it was obvious that George was participating in taking care of Andoni. Whenever we'd see them, George was the one changing Andonaki, feeding him, etc.

Asvesta vs. Petroutsas                    - 2 -                    Affidavit of Dionysis Heliotis
C 07 05535 JF

6. When I found out that Ms Asvesta wanted to take a trip to Greece with Andonaki that October to see her family, just a few weeks before her mother was scheduled to come from Greece; it just didn't sound right.

7. The following March I flew to Greece to be a witness for George at the Hague Hearing where I understood it was supposed to be a hearing to decide which Courts had jurisdiction with Andonaki. I thought this would be a "no brainer'. Andonaki was born in the US; he was a US citizen living in Capitola California as his permanent address. I would talk to the Courts and let them know that Andonaki, his father and mother were living in the US at the time of his abduction. His father was a US Citizen born in the US. Open and shut case. Well, was I wrong.

8. George and I met with a Gentleman by the name of Rallis. He was appointed by the Greek Ministry of Justice to represent Andonaki in the Hague Hearing. We met with him for about 45 minutes, maybe an hour. He told us about the Hearing and what to expect. I was shocked when I found out that George could not use his attorney to represent Andonaki and him in the Hearing. When we questioned him, he said that the Hearing was to determine "domicile" and that the Ministry of Justice was going to represent Andonaki and that George had nothing to do with anything. I had never been in a Greek Court before. There was one Judge on the Bench. No Bailiff, no one taking "minutes", just the Judge herself, in this case was taking notes.. I have to admit, I was embarrassed when the Judge pointed at me and asked me to leave the Room because I had opened up a small bottle of water to drink and she thought that was disrespectful. Mr. Rallis got up and

Asvesta vs. Petroutsas                        - 3 -                    Affidavit of Dionysis Heliotis
C 07 05535 JF

started presenting his case to the Judge. He introduced George's attorney that was present at the Court Hearing and the Judge "jumped" in and confirmed what Mr. Rallis had already told us, that his attorney could not speak in his behalf. This was a Hearing for Andoni Petroutsas and not George Petroutsas. That Andoni Petroutsas had representation with Mr. Ralli. He then introduced me as his witness.

9. The Judge asked me to describe what I know about the case and I just went ahead and started talking about how I knew the family, where Andonaki was born, how they were all very much part of our lives, how we expected our kids to grow up together. She asked me why I had traveled this far to be in Court. Then I made the mistake of saying that a child "is not a sack of potatoes", just because you don't like it somewhere, you don't grab the kid and go. My using the term 'grabbed" infuriated the Judge. She told me not to use words like that in her Courtroom. I apologized for the choice of words I used. Her attorneys started to cross examine me. They kept trying to put words in my mouth and twist the reality of what had happened. At one point, one of her attorneys was getting pretty belligerent with me on subjects that had nothing to do with where Andonaki lived. I was kind of surprised that the Judge was letting them talk to me that way, like some "bum or drug addict off the street". They were trying to turn it into a divorce proceeding and who had done what to whom. At one point, they started to ask me if Mr. Petroutsas had guns in the US, making it sound like he was a common criminal (Guns in Greece are illegal outside shotguns during hunting session and some exceptions where you can prove that you need one). All this

Asvesta vs. Petroutsas                        - 4 -                        Affidavit of Dionysis Heliotis
C 07 05535 JF

while, I'm thinking to myself, if we are here to talk about Andonaki, why are we talking about all this garbage. I turned to the Judge and asked her if I needed to respond to this line of questioning. Her response was, "well, did Mr. Petroutsas have guns in the US?" My response was that lots of people in the US have guns; they are legal if you have a license for them. There is nothing wrong or illegal about it if the guns are registered. Mrs. Asvestas attorneys didn't even bring up the subject of where Andonaki was born, where he lived, how he had gotten to Greece, nothing. I was surprised that the Judge allowed them to ramble on about stuff that had nothing to do with the reason we were there. More than anything, they focused on trying to make Mr. Petroutsas look like a bad father and husband and that Andonaki was lucky to be in Greece right now. Then I watched what was probably one of the most disappointing moments of my life. Mrs. Asvestas's mother got up to testify and I watched a woman that I liked and respected, up to that point, purger herself. She went on to tell the Judge that her daughter had quit her job in Greece and go to America at Mr. Petroutsas request, a complete lie, since I was with him the day he got the call and she informed him that she had quit her job and was coming to America. I remember how shocked he was, because there he was with a dying mother (his mother passed away from cancer later on) and his girlfriend from Greece was coming to stay with them. Mr. Petroutsas had moved in at the time to help his mother. She kept telling the judge how unhappy her daughter was in the US, this from the same woman that shared with me once how excited Mrs. Asvesta (her daughter) was about her future in the US. She went on to say that her daughter had to live in a "mobile home" where

there was so much mold that they had 2 fans running day and night. The lies kept
on going. Nowhere during this time was Andonaki mentioned.

10. I agree that a facsimile or scanned copy of my signature affixed hereto shall be
deemed to have the same force and effect as the original.


I declare under penalty of perjury under the laws of the United States of America
that the foregoing is true and correct.

Executed this 10th day of December at ___ SAN JOSE, CA. ___.

Dionysia Heliotis

Asvesta vs. Petroutsas                        - 6 -                Affidavit of Dionysis Heliotis
C 07 05535 JF

90/90  39Ad                    SILIAUOJS dNOAD ODROW              99Z91ÞÞ80Þ    80:91  Z00Z/01/Z1

B J Fadem, Esquire, Bar #118819
LAW OFFICES OF B J FADEM, APC
255 N. Market Street, Suite 210
San Jose, California 95110
408-280-1220 (voice)
408-292-4100 (fax)
fademlaw@sbcglobal.net

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF CALIFORNIA
### San Jose Division

DESPINA ASVESTA,
22 Platonos Street
Nikaia, 18454
Piraeus, Greece

        Petitioner

    v.

GEORGE PETROUTSAS
300 Plum Street, SPC 69
Capitola, California 95010

        Respondent

_____/

Case No.   C 07 05535 JF


AFFIDAVIT OF
JORDAN KOKKORIS


I, JORDAN KOKKORIS, do declare:

1. I am George Petroutsas' first cousin and make the following statements from my own personal knowledge.

2. I understand that the Greek Court claimed that George was not exercising his "custody" of his son. That can't be farther from the truth. In November of 2005, our mutual cousin was getting engaged in New York. George and his son surprised us with a visit. The people at the reception who did not know George as well as his family does, was surprised to see a father and child travel across the

country alone. Those of us, who know George, know that this is the type of person he is, and were not surprised at seeing him with his son. His love and attention for his baby is beyond any words. One only has to look at them together and they will realize that a deep bond exists between father and son.

3. My family and I had the pleasure of their company for two nights after the engagement reception. George and the baby stayed at my home and I had a chance to witness first hand the level of love they share. During this period George spent the entire time attending to the baby and his care. The conversation surrounded baby's life, and how blessed they are for having him. Even though my wife and I have three children, George insisted on caring for all of baby's needs. He bathed him, dressed him, fed him, stayed up with him when he was uncomfortable, and did not leave him for one moment. He also called his wife, who was in California, at least a dozen times. Their conversation surrounded the baby and how great he is.

4. More recently on a trip to California this past November, I once again had the pleasure of spending two days with George and his son. The level of care, concern, and love between them is something special. Father looks after son, and son looks after father at the same time. The bond between them has definitely grown, and become a part of each others lives. I cannot imagine one without the other.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Asvesta vs. Petroutsas                    - 2 -          Affidavit of Jordan Kokkoris
C 07 05535

Executed this 10th day of December at  ASTORIA  QUEENS  NewYork

Jordan Kokkoris

## PROOF OF SERVICE

TITLE OF CASE: DESPINA ASVESTA VS. GEORGE PETROUTSAS
CASE NUMBER: C-07-05535 JF/HRL

I am employed in the County of Santa Clara, State of California, over the age of eighteen years, and am not a party to the within entitled action: my business address is:    JAMES SQUARE - 255 North Market Street, Suite 210, San Jose, California 95113.

On December 10, 2007, I served the foregoing document(s) described as
MEMORANDUM AND AFFADAVIT OF CLAUDIA MORALES, SUSAN ROHOL, STELIO GREGORIOU, NINETA PAPADAVID, BESSIE PETROUTSAS, DIONYSIS HELIOTIS, JORDAN KOKKOROS on concerned parties in this action by placing a true copy thereof enclosed in a sealed envelope addressed as follows:

[]    BY MAIL. I caused such envelope(s) with postage thereon fully prepaid to be placed in the United States Mail at San Jose, California. Executed on December 10, 2007 12/10/07, at San Jose, California.

[XX]  BY FACSIMILE
            KELLY POWERS
            MILES & STOCKBRIDGE
            410-823-8123

[]    BY PERSONAL SERVICE: I caused such document(s) to be delivered at the address listed below. Executed December 10, 2007.

[]    STATE: I declare under penalty of perjury under the laws of the State of California, that the above is true and correct.

[XX]  FEDERAL: I declare that I am employed in this office of a member of the Bar of this Court at whose direction the service was made.

Dated: 12/10/2007

BRENDA MARTINEZ

## PROOF OF SERVICE

TITLE OF CASE: DESPINA ASVESTA VS. GEORGE PETROUTSAS
CASE NUMBER: C-07-05535 JF/HRL

I am employed in the County of Santa Clara, State of California, over the age of eighteen
years, and am not a party to the within entitled action: my business address is:    JAMES
SQUARE - 255 North Market Street, Suite 210, San Jose, California 95113.

On December 10, 2007, I served the foregoing document(s) described as
MEMORANDUM  AND AFFADAVIT OF CLAUDIA MORALES, SUSAN ROHOL,
STELIO GREGORIOU, NINETA PAPADAVID, BESSIE PETROUTSAS, DIONYSIS
HELIOTIS, JORDAN KOKKOROS on concerned parties in this action by placing a true
copy thereof enclosed in a sealed envelope addressed as follows:

[]    BY MAIL. I caused such envelope(s) with postage thereon fully prepaid to be
placed in the United States Mail at San Jose, California. Executed on December 10, 2007
12/10/07, at San Jose, California.

[]    BY FACSIMILE

[X]    BY PERSONAL SERVICE: I caused such document(s)  to be delivered at the
address listed below.  Executed December 10, 2007.
            RENEE DAY, ESQ.
            HOOVER & BETCHEL, L.L.P.
            THE GARDEN ALAMEDA
            1570 THE ALAMEDA, SUITE 101
            SAN JOSE, CA  95126

[]    STATE: I declare under penalty of perjury under the laws of the State of
California, that the above is true and correct.

[XX]    FEDERAL: I declare that I am employed in this office of a member of the Bar of
this Court at whose direction the service was made.


Dated:  12/10/2007

BRENDA MARTINEZ