**E-Filed 4/19/10**

# IN THE UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

### SAN JOSE DIVISION

DESPINA ASVESTA,

                    Petitioner,

        v.

GEORGE PETROUTSAS,

                    Respondent.

Case Number C 07-5535 JF

**ORDER[1] DETERMINING HABITUAL RESIDENCE OF MINOR CHILD**

The instant action arises from a child custody dispute between Petitioner Despina Asvesta ("Mother") and Respondent George Petroutsas ("Father") that has persisted for nearly the entirety of the life of their minor child, A.  Before the Court is Mother's petition under the Hague Convention on the Civil Aspects of International Child Abduction ("Hague Convention") and the International Child Abduction Remedies Act ("ICARA"), 42 U.S.C. § 11603 et seq. ("Hague petition").  Father, whose own Hague petition was denied by a Greek court, opposes Mother's petition.  The Court has considered the parties' briefs as well as the additional evidence

---

[1] This disposition is not designated for publication in the official reports.

1    submitted and the oral argument of counsel presented at the hearing on January 26, 2010.

2    Because the Court now determines that for purposes of the Hague Convention A's country of

3    habitual residence is the United States, Mother's petition will be denied.

### I. FACTUAL AND PROCEDURAL BACKGROUND

The Ninth Circuit summarized the relevant factual and procedural background of the

instant petition in its published opinion in *Asvesta v. Petroutsas*, 580 F.3d 1000 (9th Cir. 2009),

as follows:[2]

> George Petroutsas, a Greek and American dual citizen, and Despina
> Asvesta, a Greek citizen, married in Watsonville, California on March 10, 2002.  In
> January 2003, the couple settled in Capitola, California.  Two years later, Asvesta
> bore a son (the "child"), the couple's only child.  According to Petroutsas, the
> couple never lived together in Greece.  Nonetheless, the child, like his father, is a
> Greek and American dual citizen and was raised to speak both English and Greek
> fluently.
>
> By the end of 2005, the couple's marriage had begun to deteriorate due to
> the couple's diverging goals for their life together.[3]  Specifically, Asvesta wanted to
> return to Greece; Petroutsas wanted to stay in the United States.  A lengthy e-mail
> from Petroutsas to Asvesta, dated November 2, 2005, pleaded, "This place
> [California] is where we must be right now, it makes sense for us, I'm not asking
> you to like it here . . . .  Let us start making right moves together both personally
> and economically, let me gradually open a chapter of my life in Greece . . . let [the
> child] grow a little older."  The e-mail concluded:
>
> > If you don't agree with the above, to go to Greece slowly, calmer and
> > smarter than giving up everything and leaving, I have to ask you for
> > a divorce, and we won't be neither the first or last.  Go to Greece
> > with the child and we will see how I will come to Greece to visit
> > him.  I know you neither want or ask for this, but how you have
> > brought these issues to me, this is how you have caused me to react.
>
> On November 8, 2005, with the written consent of Petroutsas, Asvesta and
> the child, not yet six months old, left for Greece to visit family.  Petroutsas' consent
> stated, "I hereby consent to Despina Asvesta Petroutsas to travel with our son . . .
> between the following dates[:] November 8, 2005-December 8, 2005."
>
> Petroutsas maintains that Asvesta told him on November 19 that she was not
> returning from Greece, a fact Asvesta denies.  In any event, on November 29,
> before his consent expired, Petroutsas called Asvesta in Greece to advise her that he
> had reported her to authorities in the United States for abducting the child.  The
> following day–while Asvesta and the child were in Greece–Petroutsas filed a

25   _____

[2]All footnotes within this excerpt are from the Ninth Circuit opinion; however, the
26   footnote numbers have been changed to remain consistent with the rest of this order.

27   [3]The parties dispute the existence of other factors, including infidelity and abuse, that may
have led to the failure of their marriage.  These allegations are, for the most part, irrelevant to this
28   appeal.  To the extent that allegations of abuse are relevant, we take note of them as appropriate.

Case No. C 07-5535 JF
ORDER DETERMINING HABITUAL RESIDENCE OF MINOR CHILD
(JFLC3)

petition for dissolution of marriage in the Superior Court of California, County of Santa Cruz (the "California court").  Petroutsas also sought custody of the child.  After a hearing at which Asvesta's counsel was present, the California court granted Petroutsas temporary custody of the child.

Asvesta alleges that while she was still in Greece, and before her scheduled date of return from Greece, the Greek police discovered a suitcase left by Petroutsas in Asvesta's family's home containing a gun, handcuffs, leg cuffs, credit cards, a pillow, telephone wires, and bullets.  According to Asvesta, the discovery of these items prompted her on December 5, 2005, to file for divorce against Petroutsas in the Athens Multimember Court of First Instance ("Athens Multimember Court") and to file for temporary custody of the child with the Athens One-Member Court of First Instance ("Athens One-Member Court").  On December 9, 2005, the Athens One-Member Court issued an injunction granting Asvesta temporary custody of the child and scheduling a hearing on the custody petition for January 9, 2006.  That hearing was later postponed.

Back in California, on January 25, 2006, after proceedings in which Asvesta was again represented by counsel, the California court found that the child's habitual residence was Santa Cruz County, California, and concluded that it had jurisdiction to hear the case.[4]  The court entered a permanent modifiable order granting Petroutsas sole legal and physical custody of the child and ordering Asvesta to return the child to Petroutsas "immediately."

*Hague Proceedings in Greece*

On February 20, 2006, with the California custody order in place, Petroutsas filed a Hague petition for the return of the child to the United States with the United States Central Authority.[5]  The petition alleged that Asvesta had wrongfully retained the child in Greece in violation of Petroutsas' custody rights.  The United States Central Authority transferred Petroutsas' petition to Greece's Central Authority.  Although the record does not detail how Greece's Central Authority handled the petition, it was eventually filed with the Piraeus One-Member Court of First Instance (the "Greek Hague court").  The Athens Multimember court, where Asvesta filed her custody proceeding, stayed that matter pending resolution of the Hague petition pursuant to Article 16 of the Convention.

On March 23, 2006, the Greek Hague court held a hearing on Petroutsas' petition.  Both parties voluntarily appeared.  According to Asvesta, the parties had

---

[4]Although the California court in its order used terms that ring of a Hague Convention proceeding, Petroutsas did not seek relief from the California court pursuant to the Hague Convention or ICARA.

[5] The Hague Convention requires each contracting state to designate a "Central Authority" to "coordinate and 'channel'" the cooperation among contracting states that the Convention envisions.  [Elisa] Pérez-Vera[, *Hague Conference on Private International Law*] 437, ¶ 42 [(1982)]; *see also* Hague Convention, art. 6.  "The Central Authority of the State where [a wrongfully removed or retained] child is shall take . . . all appropriate measures in order to obtain the voluntary return of the child." *Id.* art. 10.  If a Central Authority receives a petition concerning a child not located in that country, "it shall directly and without delay transmit the application to the Central Authority of that Contracting State [where the child is located] and inform that Contracting State and inform the requesting Central Authority or the applicant." *Id.* art. 9.

notice of the hearing, were represented by counsel, and were provided with the opportunity to be heard and participate fully through counsel. Petroutsas, on the other hand, alleges that, although a non-lawyer representative of the Greek Ministry of Justice appeared to pursue Petroutsas' petition on his behalf, neither Petroutsas nor his personal lawyer were permitted to speak or testify. Petroutsas argues that the appointed representative was not familiar with the facts of the case and did not adequately represent his interests at the hearing.

The following day, on March 24, 2006, the Greek court issued an order dismissing Petroutsas' petition for the return of the child, concluding that it was "not bound to order the minor's return to the USA."[6]   App. at 58. The Greek court found the following pertinent facts:

• Petroutsas had assured Asvesta that their "stay in the USA was temporary and that soon they would go back to Greece for permanent settlement."

• Asvesta had to obtain supplemental employment because Petroutsas' job as a real estate broker "yielded a very low income which was not enough to deal with his and the respondent's livelihood needs."

• Since 2004, Petroutsas had "bec[o]me violent towards the respondent, making scenes, . . . talking bad to her, . . . swearing at her and insulting her before third parties, and was inexcusably absent from their house."

• After the birth of the child, Petroutsas "was indifferent to his conjugal and family obligations and was making bad scenes before the eyes of the minor."

• The couple had no "mental communication and physical contact" starting in September 2005 and communicated via e-mail because Petroutsas refused to talk to Asvesta.

• Petroutsas had made particular demands regarding any move he would make to Greece, and told Asvesta that if she did not agree, he would be forced to ask for a divorce.

• Petroutsas "suggested" to Asvesta that she "go to Greece together with their minor child and that he would go there to see" the child.

• Petroutsas consented to Asvesta's departure with the child on November 8, 2005, and gave Asvesta "permission to travel together with their son during the period of time from 8 November, 2005 to 8 December, 2005" and that Asvesta had arranged to return to the United States with her child and her parents for the Christmas holidays.

• Petroutsas reported Asvesta to the authorities on November 29, 2005, and threatened Asvesta that she would go to jail and never see the child again.

---

[6]An official translation of the Greek court's ruling is attached as an appendix to this opinion. [Note: not included in this order.]

Case No. C 07-5535 JF
ORDER DETERMINING HABITUAL RESIDENCE OF MINOR CHILD
(JFLC3)

• Petroutsas had been unfaithful to Asvesta since December 2004.

App. at 54-56.

The Greek court concluded that the child had not been "illegal[ly]" removed to and retained in Greece by his mother because (1) "Petroutsas . . . consented . . . to his move and stay in Greece, giving for this purpose to [Asvesta] a related written permission and suggesting to her to stay in Greece together with the minor;" (2) "Petroutsas was not virtually exercising the right of custody of the person of the minor at the time of his move, since . . . he was indifferent to his family obligations, he was not engaged in the minor's care and was indifferent to his pyschosomatic [sic] development;" and (3) there was

> a severe danger that the minor's return to the USA to [sic] expose him to mental tribulation, since he will be deprived of his mother's presence, affection, love and care at the delicate age of 12 months, he will be deprived of the security and stability that he feels near his mother and his mental bond with her will be broken.

App. at 57-58.

Petroutsas did not appeal this ruling because, he alleges, the appointed representative from the Greek Ministry of Justice failed to do so. As a result, the Greek court's factual findings remain unchallenged. Petroutsas, however, did file a "cassation appeal." According to the district court testimony of Grigoriou Stilianos, Petroutsas' Greek legal advisor, a cassation appeal is a limited procedural challenge that allows a party to appeal only the legal conclusions of the lower court.[7]

After the Greek Hague court denied Petroutsas' petition, he filed a petition in the Athens Multimember Court custody case seeking visitation with the child in Greece. While this petition and Asvesta's original custody petition were pending, the parties, through counsel, entered into a voluntary settlement agreement establishing a schedule pursuant to which Petroutsas could visit the child in Greece. Petroutsas also filed a petition in the Piraeus One-Member Court of the First Instance[8] seeking recognition of the California court's original January 25, 2006, order that granted him temporary custody of the child. On March 13, 2007, the court declined to do so, and its order was affirmed by the Piraeus Court of Appeal.

On April 23, 2007, the Athens One-Member Court finally held a hearing to consider Asvesta's original petition for custody of the child and Petroutsas' petition for visitation rights. The court awarded temporary custody to Asvesta and granted Petroutsas supervised visitation in Greece. A month later, however, the California court modified its prior order, granted temporary sole custody of the child to Petroutsas, and ordered the parties to mediate their custody and visitation dispute in

---

[7]The cassation appeal is apparently still pending. One member of the Greek Supreme Court, however, issued an opinion on whether to accept the appeal. That opinion stated that the Greek court that ruled on the Hague petition had erred as a matter of law because it did not follow the procedural rules of evidence at the Hague hearing. Stilianos testified that the Greek Supreme Court would likely overturn the Greek Hague court's order and remand for a new hearing and that the court would likely issue a decision in the cassation appeal by April 2008.

[8]Although Petroutsas' Hague petition was filed in the Piraeus One-Member Court of First Instance, this proceeding, it appears, was completely separate from the Greek Hague proceeding; two different judges presided over the two matters.

5

1   Greece.

2              In July 2007, during supervised visitation with his son, Petroutsas took the
     child, fled from Greece to Canada and then returned to California where, as far as
3   the record reflects, the child remains to this day.  Petroutsas asserts that he took the
     child from Greece under the authority of the California court order that granted him
4   sole legal and physical custody of the child.  Asvesta, on the other hand, viewed
     Petroutsas' action as an abduction, reported the abduction to the Greek police, filed
5   charges with the Greek police against Petroutsas for kidnapping, and filed a petition
     for the return of the child to Greece under the Hague Convention in the U.S.
6   District Court for the Northern District of California.

7   *Hague Proceedings in the United States*

8              Asvesta filed her Hague petition on October 31, 2007, asserting that
     Petroutsas had abducted the child from Greece, the child's habitual residence.  The
9   court issued an order to show cause for Petroutsas to appear on November 16, 2007,
     with the child; Petroutsas did not appear.  After the court issued a warrant for
10  Petroutsas' arrest and placed the child in the national database for missing persons,
     Petroutsas appeared with counsel and the child for a show cause hearing.
11  Following an evidentiary hearing and after encouraging the parties to reach a
     voluntary settlement agreement, the district court orally granted Asvesta's petition.
12             In so ruling, the court determined that the initial question it faced was
     "simply, whether it should or shouldn't recognize and accord comity to the Hague
13  order entered by the courts of Greece."  The court, in its brief discussion of whether
     the "Greek court faithfully applied the Hague convention," observed that "the
14  Hague order entered in Greece could be criticized as giving undue weight to matters
     that are not properly considered under the Hague convention."
15             Nonetheless, the court stated that "[i]f all this court had before it were the
     Hague order from Greece and if [Petroutsas] had faithfully carried out his
16  responsibilities as a litigant with respect to that and other orders, I think this would
     be a much harder case as a legal matter than it actually is."  The court was
17  "compell[ed]" by Petroutsas' failure to comply with both the Greek Hague
     Convention order and the California court's order to mediate custody and visitation
18  issues in Greece, describing the circumstances as "simply a situation where the two
     countries or the two courts that have exercised jurisdiction over this child both
19  made orders, both which have been violated by Mr. Petroutsas."  The court
     concluded that "under both circumstances [it had] no legal choice other than to
20  grant the petition."
              On January 17, 2008, the district court ordered that the child be returned to
21  Greece, "the minor child's habitual residence," but simultaneously ordered a stay of
     the child's return pending appeal.

22  580 F.3d at 1005-09.

23      The Ninth Circuit concluded that the Greek court's decision was not entitled to comity,

24  holding that the Greek court's "failure to comply with the Hague Convention was so egregious"

25  that comity should not have been extended.  *Id.* at 1021.  The panel remanded the case to this

26  Court "to conduct its own analysis of the merits of Asvesta's Hague petition, specifically the

27

28

                                                6

1  habitual residence determination." *Id.*[9]

2  **II. DISCUSSION**

3  As the petitioner, Mother bears the burden of proving by a preponderance of the evidence

4  that Father "wrongfully removed" A. from Greece to the United States in July 2007.  *See, e.g.*, *In*

5  *re Pervot*, 59 F.3d 556, 560 (6th Cir. 1995); ICARA, 42 U.S.C. § 11601(e)(1)(A).  Under Article

6  3 of the Hague Convention removal is wrongful if:

7      a) it is in breach of rights of custody attributed to a person, an institution or any
   other body, either jointly or alone, under the law of the State in which the child was
8      *habitually resident* immediately before the removal or retention; and

9      b) at the time of removal or retention those rights were actually exercised, either
   jointly or alone, or would have been so exercised but for the removal or retention.

10  Hague Convention, art. 3 (emphasis added).   The Second Circuit has explained the legal

11  consequences of finding wrongful removal:

12      The Convention contemplates that any wrongful removal (or retention) will be
   remedied by an order for return so that the issue of custody can be properly
13      determined by a court of competent jurisdiction.  *See* Elisa Perez Vera, *Explanatory*
   *Report: Hague Conference on Private International Law*, in 3 *Acts and Documents*
14      *of the Fourteenth Session* ¶ 19 (1980) . . . .  As the Perez Vera Report states, "the
   Convention rests implicitly upon the principle that any debate on merits of the
15      question, i.e., of custody rights, should take place before the competent authorities
   in the State where the child had its habitual residence prior to its removal."
16

17  *Diorinou v. Mezitis*, 237 F.3d 133, 145 (2d Cir. 2001); *see also Holder v. Holder*, 392 F.3d 1009,

18  1013 (9th Cir. 2004) ("The Convention's focus is . . . whether a child should be returned to a

19  country for custody proceedings and not *what* the outcome of those proceedings should be."

20  (emphasis in original)).

21  The Ninth Circuit has held that courts applying Article 3 are required to answer a series of

22  four questions:

23

24      (1) When did the removal or retention at issue take place? (2) Immediately prior to
   the removal or retention, in which state was the child habitually resident?  (3) Did
25      the removal or retention breach the rights of custody attributed to the petiioner
   under the law of the habitual residence? (4) Was the petitioner exercising those

26

27      [9]Following remand, this Court extended the parental access schedule ("Access Order")
28  originally entered on January 17, 2008.  The Access Order has remained in effect pending
   resolution of the instant petition.  The Court also vacated its order awarding costs to Petitioner.

Case No. C 07-5535 JF
ORDER DETERMINING HABITUAL RESIDENCE OF MINOR CHILD
(JFLC3)

1    rights at the time of the removal or retention?

2    *Mozes v. Mozes*, 239 F.3d 1067, 1070 (9th Cir. 2001).  Here, as in *Mozes*, there is no dispute as

3    to the first question: the removal or retention at issue in Mother's petition is Father's removal of

4    A. from Greece in July 2007.  However, as in many such cases, "the crux of the issue" is whether

5    A.'s habitual residence immediately prior to the removal was Greece or the United States.

6    *Holder*, 392 F.3d at 1014.  If A.'s country of habitual residence was the United States, the Court

7    must deny Mother's petition, even if aspects of Father's conduct in seeking A.'s return were

8    objectionable.  *Mozes*, 239 F.3d at 1084.  ("Should the district court . . . reaffirm its holding that

9    the children's habitual residence had shifted to the United States by April 17, 1998, the case

10   should end there.")  Only if Greece was A.'s habitual residence in July 2007 must the Court

11   address the *Mozes* court's final two questions, as only then could the removal be "wrongful"

12   under Article 3.  *Id.*

13   **A.    A.'s Country of Habitual Residence**

14          While the Ninth Circuit has recognized that "[t]he place of birth is not automatically the

15   child's habitual residence," "if a child is born where the parents have their habitual residence, the

16   child normally should be regarded as a habitual resident of that country."  *Holder*, 392 F.3d at

17   1020 (citations omitted).  Evidence adduced at the 2007 hearing demonstrates that Mother and

18   Father lived in California together from February 2002 until November 2005, were employed,

19   were married, owned a home and had family there, and returned there after trips to Greece.

20   Mother also filed for permanent residency in the United States.  As the Ninth Circuit recognized

21   in *Mozes*, "Being habitually resident in a place must mean that you are, in some sense, 'settled'

22   there–but it need not mean that's where you plan to leave your bones."  *Mozes*, 239 F.3d at 1075.

23           Based on the facts in the record, despite Mother's statement in her affidavit that her stay

24   in California was intended to be "an extended temporary stay," (Doc. No. 163 ¶ 6) and that the

25   parents had agreed and "intended to return to Greece to begin [their] lives together and to

26   establish [their] permanent home in Greece" (*id.*), the Court finds by a preponderance of the

27   evidence that California was their habitual residence when A. was born in May 2005, and thus

28   was A's habitual residence as well.  Through her actions, Mother, at least for the time being, had

8

abandoned Greece as her place of habitual residence sometime before A.'s birth, even though it appears to be clear that she did not intend to "leave [her] bones" in California. *See Mozes*, 239 F.3d at 1075 ("[O]ne need not have this settled intention [to abandon the habitual residence left behind] at the moment of departure; it could coalesce during the course of a stay abroad originally intended to be temporary.  Nor need the intention be expressly declared, if it is manifest from one's actions; indeed one's actions may belie any declaration that no abandonment was intended.")

Mother nonetheless contends that A.'s country of residence had changed to Greece by the time Father took A. back to the United States in July 2007.  The Ninth Circuit has established the following test for determining whether a child's habitual residence has changed:

> First, in order to acquire a new habitual residence, there must be a settled intention to abandon the one left behind. . . .  Second there must be (A) an actual change in geography combined with (B) the passage of an appreciable period of time.  This period of time must be sufficient for acclimatization.

*Holder*, 392 F.3d at 1015.  The parties' dispute involves the first half of this formulation.

### 1.    Settled Intention to Abandon

To determine whether there was a settled intention to abandon one habitual residence for another, courts must "look to the subjective intent of the parents, not the children" as "[p]arental intent acts as a surrogate for that of children who have not yet reached a stage in their development where they are deemed capable of making autonomous decisions as to their residence." *Id.* at 1016-17 (citing *Mozes*, 239 F.3d at 1076-78.).  The Ninth Circuit acknowledged in *Holder* that when, as here, the "parents no longer agree on where the children's habitual residence has been fixed, we must look beyond the representations of the parties and consider 'all available evidence.'" *Id.* at 1017 (citing *Mozes*, 239 F.3d at 1076).

*Mozes* divided cases in which a child's parents cannot agree on habitual residence into "three broad categories":

> On one side are cases where the court finds that the family as a unit has manifested a settled purpose to change habitual residence, despite the fact that one parent may have had qualms about the move. . . .  When courts find that a family has jointly taken all the steps associated with abandoning habitual residence in one country to take it up in another, they are generally unwilling to let one parent's alleged reservations about the move stand in the way of finding a shared and settled

9

1   purpose.

2          On the other side are cases where *the child's initial translocation* from an established habitual residence was clearly intended to be of *a specific, delimited period*. In these cases, courts have generally refused to find that the changed

3   intentions of one parent led to an alteration in the child's habitual residence.

4          In between are cases where the petitioning parent had earlier consented to let the child stay abroad for some period of ambiguous duration. Sometimes the

5   circumstances surrounding the child's stay are such that, despite the lack of perfect consensus, the court finds the parents to have shared a settled mutual intent that the

6   stay last indefinitely. When this is the case, we can reasonably infer a mutual abandonment of the child's prior habitual residence. Other times, however,

7   circumstances are such that, even though the exact length of the stay was left open to negotiation, the court is able to find no settled mutual intent from which

8   abandonment can be inferred.

*Mozes*, 239 F.3d at 1076-77 (footnotes omitted) (emphasis added).

9
10         The facts here are most analogous to the second set of cases described in *Mozes*. When

11  Mother took A. to Greece in November 2005, she presented immigration authorities with a note

12  signed by Father consenting to a trip "between the following dates, November 8, 2005, through

    December 8, 2005." (Pet'r Trial Ex. 4.) It is not clear when or why Mother decided to stay in
13
    Greece with A. beyond December 8, 2005. What is clear from all of the available evidence,
14
    including the fact that in late November 2005 Father initiated an action in the Santa Cruz Superior
15
    Court to obtain custody rights, is that Mother and Father did not *share* the intent to abandon the
16
    United States as A.'s habitual residence at the time of Mother's departure–the time of "the child's
17
    initial translocation" from the United States.
18
           The instant facts clearly are not analogous to the first type of case described in *Mozes*, as
19
    neither party alleges that Mother and Father have ever "jointly taken all the steps associated with
20
    abandoning habitual residence in" the United States. With respect to the third type of case, even if
21
    the Court were to find that the length of Mother's visit to Greece with A. in November 2005 was
22
    "left open to negotiation" despite the signed form consenting travel for a limited period of time,
23
    the evidence is insufficient to support a finding of *mutual* intent that the stay would be indefinite.
24
                   **2.      Objective Facts Supporting Abandonment**
25
           *Mozes* held that "[w]here there is no such [shared] intent [to abandon the child's prior
26
    habitual residence] . . . a prior habitual residence should be deemed supplanted *only* where 'the
27
    *objective* facts point *unequivocally*' to this conclusion." *Mozes*, 239 F.3d at 1082 (citing *Zenel v.*
28
    *Haddow*, 1993 S.L.T. 975, 979 (Scot. 1st Div.)) (emphasis added). Mother proffers as such

                                                  10

objective facts Father's purported consent to A.'s living in Greece and to the custody jurisdiction of the Greek courts.  (*See* Pet'r Pre-Hearing Memo. 4.)

Mother argues in essence that even if he did not agree to A.'s relocation initially, by coming to Greece, participating in Greek court actions and engaging in custody negotiations in Greece outside of the formal Hague proceeding, Father consented or "subsequently acquiesced" to the change in A.'s habitual residence.  This argument is unpersuasive, for several reasons.

First, "subsequent acquiescence" is a defense, or exception, under Article 13 of the Hague Convention available to a respondent *after* the Court determines that a wrongful removal or retention has occurred.  *Mozes*, 239 F.3d at 1086 ("Should the district court find a wrongful retention to have occurred, it must make a prompt determination as to whether either of [Article 13's] exceptions is applicable and, if not, order the return of the children to Israel forthwith." (footnote omitted)).  Here, Mother bears the burden of proving that Greece is the country of habitual residence and is not entitled to the defenses provided in Article 13 in trying to *prove* wrongful removal or retention.

Second, even assuming that Mother could rely upon a finding of Father's "subsequent acquiescence" to establish an abandonment of the United States as A.'s country of habitual residence, the record does not support such a finding.  Father began his legal efforts to obtain custody in California almost immediately after Mother left for Greece and has continued to seek A.'s return  through both Hague proceedings and family-law proceedings in the Greek courts.  As *Mozes* observed with regard to the father's similar efforts there, "Given that he has litigated continually for the children's return since [the time of the retention], he obviously has not 'subsequently acquiesced' in their retention."  *Id.* at n.57.

Third, Mother's argument that Father's decision to travel to Greece and participate in the Greek custody proceedings had the legal effect of supplanting the United States's as A.'s habitual residence does not make practical sense.  The effect of her argument is that Father would have a stronger case now if he had refused to participate in any proceedings in Greece or unilaterally had taken A. back to California in January 2006 rather than July 2007.

11

**B.       Breach and Exercise of Mother's Custody Rights**

Because the Court concludes that Petitioner has not met her burden of demonstrating that A.'s habitual residence had shifted to Greece by July 2007, the Court need not address Article 3's other requirements for, or Article 13's exceptions or defenses to, wrongful removal. *See Mozes*, 239 F.3d at 1084 (holding that if the district court finds that the children's habitual residence was the United States, the country in which they were allegedly wrongfully retained, "the case should end there").

### III.  CONCLUSION

For the foregoing reasons, the Court concludes that the United States is A.'s country of habitual residence.  Accordingly, Mother's Hague petition is denied.  The Access Order shall remain in effect for sixty (60) days in order to permit Mother to seek relief in the Santa Cruz Superior Court, and to permit an orderly transition with respect to A.'s legal status.[10]


IT IS SO ORDERED.


DATED: 4/19/10

_____
JEREMY FOGEL
United States District Judge

------------------------------------------------------------

[10]Nothing in this Order should be read as ignoring or condoning the means Father ultimately employed to return A. to the United States in 2007, or as a lack of understanding on the part of this Court of Mother's concern about other aspects of Father's conduct toward her. However, these matters are immaterial to the instant legal determination. *See, e.g.*, *Asvesta*, 580 F.3d at 1016 ("While Asvesta may have experienced trying circumstances in her marriage to Petroutsas, these circumstances are not the proper focus of a Hague Convention inquiry."); *Holder*, 392 F.3d at 1013 ("The Convention's focus is thus whether a child should be returned to a country for custody proceedings and not what the outcome of those proceedings should be."). Moreover, to the extent that Father's alleged misconduct was considered by the Greek Hague court in granting Mother's petition there, the Ninth Circuit's rejection of the Greek court's analysis has preclusive effect here.

Case No. C 07-5535 JF
ORDER DETERMINING HABITUAL RESIDENCE OF MINOR CHILD
(JFLC3)